LOCKWOOD *v.* LOCKWOOD.

1. APPEAL AND ERROR—SUPREME COURT HEARS CHANCERY CASES DE NOVO.

> While the Supreme Court is aided by the findings of the trial judge in chancery cases it is not controlled by them, and, since it hears such cases *de novo*, it is the ultimate trier of the facts.

2. MARRIAGE—COMMON-LAW MARRIAGE—SUIT TO ESTABLISH.

> In a suit for affirmation of a marriage under 3 Comp. Laws 1915, § 11395, where it appears that although plaintiff and defendant had lived together for nearly six years, plaintiff had attempted to occupy the dual position of the wife of defendant and still remain the widow of a deceased soldier for the purpose of drawing a pension, having made an affidavit to that effect every three months, the agreement to presently take each other as husband and wife, necessary to constitute a common-law marriage, was lacking, and the decree of the court below in favor of plaintiff is reversed.

Appeal from Ingham; Collingwood (Charles B.), J. Submitted June 16, 1922. (Docket No. 66.) Decided October 2, 1922.

Bill by Rose Lockwood against Henry Lockwood for an affirmation of an alleged common-law marriage, and for alimony. From a decree for plaintiff, defendant appeals. Reversed, and bill dismissed.

*A. L. Chandler,* for plaintiff.

*O. J. Hood* and *R. S. Ballard* (*Dean W. Kelley,* of counsel), for defendant.

FELLOWS, C. J. We have frequently said in chancery cases that the trial judge has the advantage we

On the question of general characteristics and validity of common-law marriage see note in L. R. A. 1915E, 8.

As to sufficiency of words and conduct to constitute a common-law marriage, or of circumstantial evidence to imply marriage, see note in L. R. A. 1915E, 60.

do not possess of seeing and hearing the witnesses and that his conclusions on the facts are always helpful in our solution of them. We have examined this record having this rule in mind and are constrained to reach a different conclusion than did the circuit judge. As we hear chancery cases *de novo*, this court is the ultimate trier of the facts in equity cases, and while we are aided by the findings of the trial judge, we are not controlled by them. In the instant case we are satisfied the facts are as claimed by the defendant. The bill filed sets up a common-law marriage, prays for a decree of divorce, an accounting, the enforcement of a claimed contract to convey real estate, an injunction, and for general relief. All of the specific prayers were abandoned at the hearing and the sole relief then sought was an affirmation of the marriage under section 11395, 3 Comp. Laws 1915, and alimony.

These parties met in 1914. He was then 66, she 46 years old. Both had been married before and both had grown children. Her first husband was a veteran of the Civil War and she was drawing a widow's pension. Their acquaintance continued, and in the early fall of 1915 she commenced to keep house for him. September 27th he obtained a marriage license from the clerk of Ingham county, having made the requisite affidavit before a justice of the peace at Webberville where he resided. October 2d the parties went to Jackson. It is the claim of the plaintiff that on the way over to Jackson defendant suggested that they dispense with the marriage ceremony and pledge each other as husband and wife, that it would be just the same, and that she acquiesced and that they agreed presently to take each other for husband and wife. It is the claim and testimony of the defendant that he was very fond of plaintiff, wanted to marry her and

proposed marriage to her; that she declined because she did not want to surrender her pension; that she said that she would not give up her pension for any man; that at her suggestion it was agreed that the license to marry should be taken out; that they should go away from Webberville, return, announce that they had been married and live together there, and that she should continue to draw her pension from the government.

The parties visited relatives of defendant at Jackson where he introduced plaintiff as his wife; from there they went to Owosso where they visited plaintiff's daughter and defendant was introduced to the family as plaintiff's husband; they then returned to Webberville, and announced their marriage; defendant bought cigars for the men and candy for the ladies, and for nearly six years they lived and passed as husband and wife, plaintiff all the time down to the hearing of the case in the court below drawing her pension as the widow of her deceased husband. We are convinced that defendant had great affection for plaintiff, would have married her but for her refusal based on her disinclination to give up her widow's pension. She testifies:

"*Q.* So that the only reason on earth that you elderly people had for not going on and being married according to that license, was the fact that you wanted to save that pension?

"*A.* Yes.

"*Q.* And you have drawn the pension ever since?

"*A.* Yes.

"*Q.* And are you drawing it now?

"*A.* Yes.

"*Q.* And as the widow of your husband, Johnson, deceased?

"*A.* Yes.

"*Q.* These pension vouchers come to you in what name?

"*A.* Mrs. James Johnson.

"*Q.* When you sign them to get the money, what do you sign?

"*A.* Mrs. James Johnson."

The record discloses that the parties lived very happily together, no word of complaint falls from defendant's lips. Plaintiff's granddaughter came to live with them and was sent to school and took the name of Lockwood. They were highly respected in the community, and until this bill was filed it was never questioned but that they had actually been married by a ceremonial marriage. Righteously for nearly six years, and until plaintiff filed this bill, defendant protected plaintiff's good name in the community. Frankly he tells the court of his desire to marry plaintiff and with equal frankness he admits that he has done everything possible to hold her out as his wife. Her testimony, on the other hand, is not only self-contradictory but in several instances is in conflict with the sworn allegations of her bill. We are convinced from this record that plaintiff desired to maintain a dual existence, wife of defendant in the community where she lived, widow of a war veteran in the pension department at Washington. Each three months she filed in the pension office her affidavit that she was a widow and had not remarried. Less than a week before the hearing in the court below she drew her pension for three months as the widow of James Johnson, and she now asks this court to cover her relations with defendant with the charitable mantle of a common-law marriage, and give its sanction to a Dr. Jekyll and Mr. Hyde existence. We must decline upon this record to do so. It is not sufficient to say that both parties were equally at fault. If they are *in pari delicto* a court of equity will not extricate them from the position in which they have by their own acts placed themselves. To constitute a common-law marriage there must be an agreement to presently take

each other as husband and wife.   We do not find such agreement was ever made; on the contrary we find it was not made.

The decree will be reversed and one here entered dismissing the bill.   Neither party will recover costs.

WIEST, MCDONALD, CLARK, BIRD, SHARPE, MOORE, and STEERE, JJ., concurred.