## DE BEQUE v. LIGON et al. (No. 11556.)*

(Court of Civil Appeals of Texas. Fort Worth.
May 1, 1926. Rehearing Denied
June 5, 1926.)

**1. Adoption ⬅5.**

Child with living parents may be adopted, in view of Vernon's Sayles' Ann. Civ. St. 1914, arts. 1–6, particularly article 3, providing that parents may transfer parental authority to parties adopting it.

**2. Adoption ⬅18.**

Neither articles of adoption nor Vernon's Sayles' Ann. Civ. St. 1914, arts. 1–6, constitute adopted child member of family of adopter or invest it with privileges or duties peculiar to relation of parent and child.

**3. Adoption ⬅4.**

Married woman may legally adopt a child.

**4. Adoption ⬅21.**

Child adopted by married woman after divorce *held* entitled, on death of adopter, to all property owned by her in her separate right at death.

**5. Divorce ⬅168, 172.**

Divorce decree *held* to conclusively establish status of parties as single persons, and after former wife's death might not be disregarded or collaterally attacked by husband to secure her property.

**6. Divorce ⬅172.**

Courts will not look with favor on application of parties desiring to avoid binding force of divorce decree for some personal benefit.

**7. Divorce ⬅167.**

Divorce decree, though procured by collusion, is not therefore void, and neither can of right have it set aside on that ground.

**8. Divorce ⬅167.**

In general courts will not entertain application to set aside divorce decree procured by collusion, when made by successful party after death of former spouse for purely personal advantage.

**9. Marriage ⬅13.**

Courts closely scrutinize common-law marriage contracts.

**10. Marriage ⬅13.**

"Common-law marriage" exists when man and woman agree to become husband and wife, and pursuant to agreement live together and cohabit and hold each other out as such.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Common-Law Marriage.]

**11. Marriage ⬅50(1).**

Evidence *held* to sustain jury's finding that divorced husband and wife did not consummate common-law marriage after divorce.

**12. Evidence ⬅271(16)—In suit by divorced husband, who claimed that common-law marriage with former wife was consummated after divorce, for estate of deceased intestate former wife, testimony as to her statement in income tax returns that she was feme sole held admissible, as against objection that it was self-serving.**

In suit by divorced husband, who claimed that common-law marriage with former wife was consummated after divorce, to secure estate of intestate deceased former wife, testimony as to her statement in income tax returns that she was feme sole, made when effect on rights involved could not have been in mind, *held* admissible, as against objection that it was self-serving declaration.

**13. Appeal and error ⬅1050(1).**

Admission of evidence that former husband cashed $23,000 check of former wife, on issue of common-law marriage of divorced couple, if error, *held* harmless.

**14. Appeal and error ⬅1050(1)—In divorced husband's suit for estate of intestate deceased former wife as against adopted child, excluding his testimony that as to him adoption was induced by misrepresentations held not material error.**

In suit by divorced husband for share in estate of intestate deceased former wife as against child adopted by him and wife after divorce, excluding his testimony that as to him adoption was induced by misrepresentations that child was orphan *held* not material error, since adoption was valid as to wife.

**15. Appeal and error ⬅525(2, 3).**

Assignment of error in refusing instruction must be overruled, where record does not show that it was "refused" and signed by judge as required by rules.

**16. Marriage ⬅52.**

Instruction that common-law marriage is sufficient if man and woman expressly or impliedly agree to become husband and wife and carry out agreement by living and cohabiting together publicly and professedly as such, *held* substantially correct.

**17. New trial ⬅152.**

Where motion for new trial was filed April 13th and amended May 2d, *held* second amendment offered May 21st did not comply with Rev. St. 1925, art. 2092, §§ 28–30, requiring motion or amended motion to be presented within 30 days after filing original or amended motion.

**18. New trial ⬅56.**

Verdict may not be impeached on ground that jury in argument may have drawn conclusions which perhaps the court would not have approved and to which it gave no effect.

### On Motion for Rehearing.

**19. Estoppel ⬅34, 110.**

To take advantage of estoppel by deed as well as in pais party must plead it.

**20. Estoppel ⚖️63.**

Party may not seek to destroy an instrument and at the same time insist that the other party is bound by it.

**21. Estoppel ⚖️26.**

Articles of adoption, made by husband and wife after divorce, describing adopters as husband and wife, *held* not to estop adopted child, as against former husband seeking estate of deceased former wife, from claiming that adopters were not husband and wife.

**22. Adoption ⚖️24.**

Articles of adoption, made by divorced husband and wife, *held* not construable as contract that divorced husband have husband's share in estate of wife dying intestate.

**23. Adoption ⚖️24.**

Articles of adoption, entered by husband and wife after divorce, providing that adopted child should "share our property as provided by law," *held* not to be agreement that divorced husband should have husband's share in former wife's property, since on intestacy he would receive it only as her husband at her death.

**24. New trial ⚖️102(1).**

Refusal of new trial on ground of newly discovered evidence *held* not error, in view of apparent lack of diligence in procuring attendance of witnesses.

Appeal from District Court, Tarrant County; H. S. Lattimore, Judge.

Suit by Frank De Beque against W. L. Ligon, as administrator of estate of Maggie De Beque, deceased, May De Beque, Guy J. Price, Jr., as guardian of May De Beque, and others. From a judgment in favor of May De Beque and Guy J. Price, Jr., as guardian of May De Beque, plaintiff appeals. Affirmed.

Parker & Parker and Mike E. Smith, all of Fort Worth, for appellant.

Walker W. Saulsbury, of Temple, and Coates & Mastin and Phillips, Trammell & Chizum, all of Fort Worth, for appellees.

CONNER, C. J. Because of the voluminous character of the pleadings in this case, we shall undertake to state its nature and result in a condensed form. So stating, the suit was instituted by the appellant, Frank De Beque, against W. L. Ligon as the administrator of Maggie De Beque, deceased, and against Guy J. Price, Jr., as guardian of May De Beque, an alleged adopted daughter of said Maggie De Beque, and against certain other persons whose relation to the suit it is unnecessary to state, to recover specified property and moneys set out in the plaintiff's petition, and by the plaintiff alleged to be claimed by and in possession of the administrator Ligon. The plaintiff alleged that he, under the family name of Riggins, was married to Maggie De Beque in 1883, and con-

tinuously thereafter lived with her as her husband and she as his wife until the date of her death, which occurred in December, 1923; that after their marriage the plaintiff and his said wife, for convenience and business purposes, adopted the name of De Beque in conducting an amusement theater in Fort Worth, as a result of which the property described in plaintiff's petition had been accumulated; that Maggie De Beque died without children entitled to receive any part of her property; and that all debts of the estate had been paid; and that plaintiff was therefore entitled to possession thereof.

The defendants answered by special and general denials and a number of special pleadings, among others, alleging that on May 5, 1905, in the district court of Tarrant county, Tex., Frank and Maggie De Beque had been duly divorced; that in the decree of divorce the property now claimed by plaintiff had been vested in Maggie De Beque; that later, to wit, on October 23, 1917, Maggie De Beque and the plaintiff, Frank De Beque, joined in the formal and legal adoption of the defendant May De Beque, by virtue whereof May De Beque, as the sole and only heir of Maggie De Beque, was entitled to the property in question.

To these pleas the plaintiff answered that the divorce in 1905, pleaded by the defendants, was as between Frank and Maggie De Beque a consent decree and secured for "business reasons and convenience"; that notwithstanding the decree for divorce they continued their business and marital relations precisely as before, living and cohabiting together as husband and wife; that the adoption of May De Beque pleaded by the defendants was of no effect in that at the time May De Beque, then named May Hiller, was in an orphans' home in the city of Fort Worth, and it was represented by the superintendent of the home that May Hiller's parents were dead, and hence there was no living person who would have the authority to deprive the plaintiff and his said wife of the society, aid, and comfort of the adopted child; that such representations constituted a material inducement to the plaintiff for the execution of the articles of adoption; that such representations were false in that in fact May Hiller had parents living, who, in August after the death of Maggie De Beque, repudiated the adoption and claimed and took possession and control of the adopted girl. As relating to the defendants' plea of divorce, the plaintiff's pleadings seem to present the theory that after the divorce the agreements, continued marital relations, and business arrangements of Frank and Maggie De Beque constituted a common-law marriage, effective as such even though the formal decree of divorce should be held to be enforceable. The specific allegation was:

⚖️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"Plaintiff says that on the said 5th of May, 1905, he and his wife agreed and understood that they had not in fact been divorced, and that they were still man and wife, and they continued on in that relationship, and with that understanding and agreement, until his wife's death."

The case was submitted to a jury on a charge which, together with the answer of the jury to the issues submitted, is as follows:

"Gentlemen of the jury, this case is submitted to you upon special issues, each of which you will answer by unanimous consent. To aid you I give you the following definition: A common-law marriage is sufficient if a man and woman mutually agree and consent together to become husband and wife, and thereafter carry out that agreement by living and cohabiting together as husband and wife, publicly and professedly as if the conjugal relation existed, living in like manner as marks the intercourse between husband and wife. Such agreement may be express or implied, but if implied such cohabitation must be professedly as husband and wife, holding each other out to the public as such, so that by their conduct toward each other they may be known as husband and wife.

"Now, bearing in mind the foregoing definition, answer:

"1. Did Frank De Beque and Maggie De Beque, after the 1905 divorce, consummate a common-law marriage as that term is defined to you? Answer: No.

"2. If you have answered No. 1 'No,' do not answer No. 2, but if you have answered it 'Yes,' then answer: When was such agreement for said common-law marriage, if any there was, made? Answer by date.

"The burden of proof is upon the plaintiff to establish by a preponderance of the evidence the affirmative of Nos. 1 and 2. You are the exclusive judges of the credibility of the witness and of the weight to be given their testimony and of the facts proved, but you receive the law from the court and will be governed thereby."

The court further instructed the jury without objection as follows:

"Conforming to your request for a definition of the words 'implied' and 'professedly,' I give you these definitions: Implied means fairly to be inferred from the words used and the act performed. Professedly means openly declared, avowed, acknowledged."

On the incoming of the answer of the jury to the issues submitted, judgment was rendered in favor of May De Beque and her guardian, Guy J. Price, Jr., for all of the property in the hands of W. L. Ligon, as administrator of the estate of Maggie De Beque, the court expressly finding that the administration was ready to be closed, and certifying the judgment to the county court of Tarrant county, Tex., with direction to deliver the property to Guy J. Price, Jr., as guardian of said May De Beque.

Appellees object to our consideration of appellant's assignments, but the issues and property rights involved seem important, and we shall not spend time or effort in discussing the form in which the questions are presented, but shall endeavor, as best we can, to dispose of the questions as the record has presented them to our minds.

Appellant's principal contentions seem to be that the adoption proceedings of May De Beque, referred to in the pleadings, should be disregarded and held not effective, on the ground of misrepresentations made to Frank De Beque at the time, as alleged, and that the evidence of a common-law marriage between Frank and Maggie De Beque at the time of and after the divorce in 1905 is of such undisputed character as to require this court to set aside the verdict and entitle Frank De Beque to a judgment in his favor for the property in controversy. We shall undertake to dispose of these questions in the order mentioned.

Articles 1 to 6, inclusive, of title 1, Vernon's Sayles' Civil Statutes 1914, are as follows:

"Art. 1. Any person wishing to adopt another as his legal heir may do so by filing in the office of the clerk of the county court of the county in which he may reside a statement in writing, by him signed and duly authenticated or acknowledged, as deeds are required to be, which statement shall recite, in substance, that he adopts the person named therein as his legal heir, and the same shall be admitted to record in said office.

"Art. 2. Such statement in writing, signed and authenticated or acknowledged, and recorded as aforesaid, shall entitle the party so adopted to all the rights and privileges, both in law and equity, of a legal heir of the party so adopting him; provided, however, that if the party adopting such heir have, at the time of such adoption, or shall thereafter have, a child begotten in lawful wedlock, such adopted heir shall in no case inherit more than one-fourth of the estate of the party adopting him.

"Art. 3. The parent or parents of any child, who is to be adopted as provided in articles 1 and 2 of this title, may, by an instrument in writing, duly signed and authenticated or acknowledged as deeds are required to be, transfer their parental authority and custody over said child so adopted to the party so adopting such child.

"Art. 4. After the execution of such an instrument of writing, duly acknowledged or authenticated as aforesaid, the parents shall thereafter be barred from exercising any authority, control or custody over such child as against the party so adopting him.

"Art. 5. The child or children so adopted shall have the same rights as against the person or persons adopting said child or children for support and maintenance, and for proper and humane treatment, as a child has, by law, against lawful parents.

"Art. 6. It shall be unlawful for any person adopting any child under this title to transfer his authority and custody to any other person."

[1-4] In form the adoption of May De Beque seems in all respects to be in compli-

ance with the articles quoted. That is to say, it is in writing, duly signed on the 23d day of October, 1917, by Maggie and Frank De Beque, and duly acknowledged before a notary public on the same day, the acknowledgment being in the form prescribed for the execution of written instruments conveying land by husband and wife, and it was duly recorded in the clerk's office of the county court of Tarrant county. The issue of its validity and effect was not submitted to the jury, nor did appellant request the submission of any such issue, and the finding that must be imputed to the court from its judgment evidently is that in all respects May De Beque was the duly adopted daughter of Maggie De Beque, and the only ground upon which there can be a color of reason for a holding on our part to the contrary is that at the time of the adoption of May De Beque it was represented to Frank De Beque that she was without living parents and an orphan, etc., as he pleaded. We conclude that we cannot disregard or hold of no effect the adoption on such grounds. It is to be noted first that the benefits of the articles of the statutes quoted are not confined to children without living parents. On the contrary, a necessary implication from the terms of article 3, a child with living parents may be legally adopted by another. It is provided in this article that the parent or parents of any child "who is to be adopted as provided in articles 1 and 2" may transfer their parental authority and custody over the child to the parties so adopting the child. Neither the articles of adoption nor the statute constitute the adopted child a member of the family of its adopter or invest such child with the privileges and duties peculiar to the relation of parent and child as does the civil law. See Eckford v. Knox, 67 Tex. 200, 2 S. W. 372. This case was referred to with approval in Harle v. Harle, 109 Tex. 214, 204 S. W. 317, 15 A. L. R. 1261, where it was said by our Supreme Court that:

"As announced in Eckford v. Knox, 67 Tex. 200, 2 S. W. 372, adoption under our statutes does not constitute the adopted person a member of the family of the adopter, and does not confer the privileges nor impose the duties which arise from the relation of parent and child, as was the case under the civil law, but, on the contrary, the complete effect of compliance with article 1 is, as declared in article 2, to put the adopted person in the same position with respect to succession to the estate of the adopter, on his death, as a child would occupy, except that as against a child born in lawful wedlock, the adopted person cannot take more than one-fourth of the estate. It necessarily follows that adoption in Texas does not give the adopted person the legal status of a child."

It is also undisputed in the testimony that May De Beque lived with Frank and Maggie De Beque from the time of her adoption until the death of Maggie De Beque in 1923, and thereafter with Frank De Beque until in Au-

gust, 1924, when it seems she took up her residence with relatives in another county. It is to be further noted that there is nothing presented in appellant's pleadings or in the evidence which tends to show that Maggie De Beque at any time after the adoption disaffirmed it or complained of its terms, or was in any way adverse to the enforcement of its legal effect. She died intestate, and we must presume from the record that it was her purpose and intention that May De Beque should, in accordance with the legal effect of the articles of adoption, be the object of her bounty, and if it be conceded that at the time Maggie De Beque occupied the status of a married woman, we know of no decision, nor has any been cited to us, holding that a married woman may not legally adopt a child as provided in the statutes. We think, therefore, that we must hold, and do hold, that May De Beque, upon the death of Maggie De Beque and by virtue of her adoption, was entitled to hold and receive all property held and owned by Maggie De Beque in her own separate right at the date of her death, and in this suit she is not claiming otherwise.

[5-11] The further controlling question is, does the evidence sufficiently support the jury's finding that Frank De Beque and Maggie De Beque, after the 1905 divorce, did not consummate a common-law marriage as that term was defined in the court's charge?

The plaintiff, Frank De Beque, testified in substance that they had lived in Fort Worth since 1897; that he had married Maggie De Beque in 1883 in Dallas; that his real name was Frank Riggins, and her name was Maggie Mawhorn; that at the time of their marriage Maggie owned no property, and that the plaintiff was then engaged in the show business; that he lived with her until her death; that they ran a theater in Dallas for about six years, then lived in the Panhandle about five years, except when they were traveling on the road in the theatrical business; that they came to Fort Worth in 1897 and engaged in the theatrical business on Rusk street, now known as Commerce street; that the name of the theater was the "Standard Theater"; that they lived in a boarding house conducted by the witness, and in which they boarded all the theater employees; that under this arrangement they lived from 1897 to 1909, after which they went to live on a ranch about 1½ miles out from Fort Worth on the Weatherford road; that the ranch consisted of 500 acres of grazing land and 275 acres of farm land; that he built a house of seven rooms on the ranch, and the witness and Maggie De Beque lived in it until 1919 or 1920; that no other family made their home there except a man and his wife who did the cooking; that they lived on that ranch some two or three years; that May De Beque lived with them; that they moved from the ranch to a home on

Lipscomb street in Fort Worth, where the witness and Maggie De Beque continued to live together until she died; that the witness and Maggie De Beque never had any children of their own, and upon her death she did not leave a will; that while engaged in the theater business Maggie De Beque assisted and looked after the women folks working in the theater; that at the time of the divorce in 1905 the witness and Maggie De Beque were living together; that the divorce made no change in their way of living; that they continued to conduct the theater business as before until they went on the ranch; that Maggie was a club swinger and walked a slack wire and did a skipping rope dance; that the witness was an aerial performer; that they both performed in the show; that he deeded the Standard Theater to her as a gift; "I gave her everything I had—made her a present of it."

His further testimony was to the effect that the name De Beque was adopted as a stage name, and that the divorce was granted for business reasons and convenience; that at or about that time he ran race horses and would bet thereon, and they did not want to imperil the property they had made, but at all times both before and after the divorce they lived together as husband and wife; that when they sold their ranch west of Fort Worth Maggie De Beque gave him a check for $23,000, which he cashed at the bank as his part of the cash received.

In behalf of plaintiff, Alice Bradley testified that she knew Frank and Maggie De Beque some time about 1895 and 1896, and worked as cook and maid from that time until 1909, 1910, or 1911; that at the time they operated the Standard Theater Frank and Maggie De Beque also conducted a boarding house in which they lived and boarded the theater employees; that Maggie and Frank De Beque lived together "like any other man and wife," and so continued until she left; that she lived with them on the ranch for several years; that after they moved to the ranch and Frank De Beque was traveling he would write and inclose money to Maggie; that they would travel together and lived together on the ranch as they had before the divorce; that the evening before the divorce case was to be called Maggie said to the witness, "You wake me next morning—that divorce case comes up—you wake me and fix a cup of coffee"; that Frank De Beque was there the next morning when the witness dressed Maggie; that they were in bed, and she carried coffee to them; that they were sleeping as they had been sleeping all the time—sometimes they slept in the same room and sometimes they did not—sometimes they would be in the same bed and sometimes not —that as to those conditions with reference as to how they slept and where they slept, they never made any change after the divorce; that it was the same on the ranch as

286 S.W.—48

before; that there were no interruptions of their living together "as man and wife"; that she was with Maggie De Beque some 50 or more days before she died; that Frank De Beque was there at the time of her death, and during her sickness "there was no change in their relationship in regard to the manner in which I have testified they lived, up to the time of her death; he would help me tend to her, and he would help me lift her in and out of bed and all like that—fix the bed and everything like that."

E. J. Bryant, in behalf of plaintiff, testified to the effect that he was the nephew of Frank De Beque, and became acquainted with Maggie De Beque at the time of their marriage in 1882 or 1883; that he worked in the Standard Theater when they came to Fort Worth —worked for them from 1898 to 1900 tending bar, in connection with the theater; that Frank De Beque paid him and also paid the employees; that the boarding house of the De Beques was located immediately behind the theater; that he also worked for them while they were living on the ranch, taking care of the horses; that no other family except the De Beques lived on the place at the time he was there; that he was in and around the house at all times of the day and night; that sometimes Frank De Beque would sleep on the porch, sometimes in his room, or in the room with Maggie De Beque; that he also knew them and visited with them when they were living on Dowman street; that he visited them frequently, and was there a few days before Maggie De Beque died; that he knew of the divorce between them and considered it to be a fact from that time on; that he did not know that he ever heard Maggie De Beque introduce Frank as her husband, but it was a common phrase with her, "My husband, Mr. De Beque"; that from the time the divorce was granted they were regarded as husband and wife. He further testified:

"I know their reputation, based on how people regarded them here who knew them in this community, as to being husband and wife up to the time she died. It was that they were husband and wife, lived together as such."

Cross-examined, he testified:

That he had heard people around the theater say that they were husband and wife; that "Mr. Epstein and his wife is one I can recall. It was a common occurrence around the theater like we would talk about anybody. I did not discuss with them whether or not they were married. I knew about their reputation because I was with them. The divorce did not mean anything to me. I knew they had been divorced; everybody understood that around there—divorced for business reasons. As to what I mean by 'business reasons,' my uncle had a faculty of liking to sport a little, and my aunt was afraid he would get out on a tantrum and lose money, and they agreed to put the property in her name to keep him from spending it. I discussed it with her. He said,

'You can have it all.' He said, 'I don't want it.' She had had it all her life anyway. I don't know whether that was her property or not. That was the understanding, that he gave it to her. That was the conversation between them. I suppose it was her property after that. I don't know. I never seen the deeds to it, but that was the understanding.'

He further testified:

That Maggie De Beque allowed Frank De Beque to handle their property and continued to do so up until her death, as far as his personal knowledge extended; that "Maggie De Beque said: 'He will go off, and is liable to get drunk and play Fairbanks and blow it all in. I am going to make him turn it over to me.' That the purpose was so he could not sign checks and go off and gamble it off or sell the property."

Mrs. H. V. Cherry testified in behalf of the defendants: That she lived on the ranch west of Fort Worth for a period of five or six years, and Mrs. De Beque visited there frequently. That when she first knew Maggie and Frank De Beque they were not divorced. That subsequently she learned that they had been. That after she left the farm she lived with Mrs. De Beque for some time and visited them while Mrs. De Beque was sick and remained with her about nine or ten days. That she discussed with Mrs. De Beque after the divorce decree as to whether or not she and Frank De Beque were husband and wife. That Maggie said they were divorced, and that was all she knew about it. That during this time Frank De Beque had one room across the hall, and Maggie had the other room. That they did not occupy the same room. "From my observation, the appearance of the two together there was not that of man and wife." That the first time her husband went to work for them Mr. De Beque owned the farm. That after that when they were there, when the De Beques were separated, the farm went to Maggie, and all the dealings were through her. That she had a conversation with Frank after the divorce, and he stated they were divorced. That she did not know of Frank doing anything outside of working for Maggie around the place. That he drove her car. That she had seen her give him money and heard her fuss at him for not giving all the money back to her or not accounting to her. That she called him to strict account for everything. That Mrs. De Beque paid the witness and her husband.

Cross-examined, she further testified:

That while on the farm Frank De Beque took care of the car and read in the house. That he "was in his room, and she was in hers. I have never seen her in his room, just about like you were living here, and I was living there, and some one living over there. I don't think they were living like any other man and wife. That most men and wives live in the same room, and there is just quite a good deal of difference."

This witness further testified to a number of trips to different places that Mrs. De Beque took with Frank De Beque, and other circumstances showing an intimate relation, but reaffirmed her statement that she did not think they lived together as husband and wife.

Sterling P. Clark testified in behalf of defendant to the effect that he was sheriff of Tarrant county in 1896, 1898, and 1900, and again from 1918 to 1920; that the Standard Theater was operated while he was sheriff during his first years; that the theater was located in the section of the city known as the "Acre"; that a saloon was operated in connection with the theater; that Frank and his wife were managers of the theater; that they were understood to be husband and wife while running the theater, but that he understood later they were divorced.

Frank Ligon testified to the effect that he was in the real estate business in Fort Worth, and his father was administrator of the estate in controversy; that he had known Frank De Beque for 15 or 20 years; that he had known Maggie De Beque the same length of time; that during her life he helped her with her property and collected rents, making statements, paying taxes, etc.; that Maggie De Beque carried all her bank accounts and property in her own name; that he made out her income taxes; that she would furnish the data, and he, the witness, would make out the statements and take her affidavit to them; that the first tax report he made out for her was in 1917; that he had the "work copy" with him, the original being sent to the Internal Revenue Department; that where the question in the return calls for and asks the question whether or not they were married and living as husband and wife at the time of making, Mrs. De Beque said "No" with respect to that; that was the case in each of the returns that was made; that there were no community returns made as of man and wife; that this was true of the tax returns made in 1917 and 1918; that "each and every one of these copies that I refer to are original income tax returns, copies of which were signed by her and sent in to the government, and I have had them right in my desk since they were made out, I delivered them up here"; that on July 26, 1917, he took the acknowledgment of Maggie De Beque as a feme sole to a release from Maggie De Beque to T. R. Ray et al.; that on March 8, 1918, he took the acknowledgment of Maggie De Beque as an unmarried woman to a deed to R. A. Smith. "It is true that you have introduced in the record 15 different acknowledgments that I have taken of Maggie De Beque as an unmarried woman, the last one being to the Dallas Trust & Savings Bank, acknowledged by her on April 2, 1923." In this connection the defendant introduced in evidence several conveyances to Maggie De Beque during the year 1901, and

a warranty deed to Maggie De Beque, "a feme sole," dated July 5, 1909; and another deed to her, "a feme sole," dated February 19, 1921; and another to her as "a feme sole," dated August 7, 1913; a release of a deed of trust by Maggie De Beque to W. L. Ligon on November 4, 1916; a warranty deed from Maggie De Beque, dated April 9, 1919.

The witness Frank Ligon further testified that his connection with the business of Mrs. De Beque began about January 1, 1916; that he had known both Frank and Maggie prior to that time; that they were practically always together; that he collected rents from property in the name of Mrs. De Beque; and that it frequently happened that she would hand the bank book and checks to Frank and direct him to make the deposit; that that course continued up until a short time before her death; that in making up the income tax returns, Maggie De Beque always claimed that she had an adopted child dependent upon her, and claimed an exemption for May De Beque in those returns.

Mr. Sidney Samuels, a practicing lawyer of Fort Worth for some 20 years or more, testified that he knew Maggie De Beque in a professional way as a client of his; that he prepared the petition of Maggie De Beque against Frank De Beque in the divorce suit; that he had been employed by Maggie De Beque for that purpose and got the facts related in the petition from Maggie De Beque; that subsequently a decree of divorce was granted pursuant to the petition; that there was no attempt on his part or that of Maggie De Beque to arrange this divorce as "one of convenience," or anything of that sort.

Guy Price testified, in substance, that he was the vice president of the F. & M. National Bank and the guardian of May De Beque; that Maggie De Beque carried an account with the bank in which he served, and he was familiar with that account in a general way during the latter part of 1907 and 1908; that Maggie De Beque would make deposits and withdrawals, and the account was carried in her name; that no check was honored save those signed by Maggie De Beque.

Morgan Bryan testified in behalf of defendant to the effect that he had been a practicing lawyer for some 34 years, during which time he had occasion to know Maggie De Beque and to have represented her; that on one occasion he filed suit for her, a single person, and recovered judgment in her name; that she, as "a feme sole," assigned him a one-fourth interest in the judgment; that in April, 1917, he discussed with Mrs. De Beque the question of writing a will; that she gave him the data and information by which it was prepared, but that the will was never executed; that she referred to Frank De Beque as her former husband.

H. V. Cherry testified in behalf of the de-

fendant that some 20 years ago he bought hay on the farm of the De Beques west of Fort Worth; that he heard about them getting a divorce; that Mrs. De Beque told him they had been divorced; that he heard her say that a number of times; that he had occasion to note the conduct of Frank and Maggie De Beque at the times they were together on the farm; that he "never saw anything in their conduct to lead me to believe they had remarried or were husband and wife."

Dr. C. O. Harper testified that he was a practicing physician, and in 1899 and 1900 was called to see the De Beques in a case of sickness; that at that time they were living on Commerce street at the Standard Theater property; that he continued to treat them professionally until a short time before Maggie's death; that he remembered the occasion of Maggie securing a divorce from Frank; that she had told him that she had done so; that after he had been advised that she had been divorced "there was nothing I noticed in their conduct of one toward the other that would lead me to believe they had remarried or were man and wife; I never thought of anything of the kind. I had a discussion with her about Frank, why he was still hanging around, in just an incidental way. She just made the remark that she was taking care of him or going to take care of him—some remark of that kind."

Other testimony pro and con of similar tendencies was offered which we do not deem necessary to set out, it being our purpose only to indicate the general character of the evidence before the court and jury. From the whole we conclude that it cannot be said that the record fails to support the verdict of the jury. No attempt on the part of Frank De Beque or any other person appears to have ever been made to vacate or otherwise disturb the legal effect of the divorce decree, and it undoubtedly conclusively established the status of Frank and Maggie De Beque as single persons, and after her death cannot be disregarded or collaterally attacked by Frank in order to secure property that belonged to her. See In re McNeil's Estate, 155 Cal. 333, 100 P. 1086; Estate of James, 99 Cal. 374, 33 P. 1122, 37 Am. St. Rep. 60; Belknap v. Stewart, 38 Neb. 304, 56 N. W. 881, 41 Am. St. Rep. 729; 9 R. C. L. § 271, p. 400; 19 Corpus Juris, 179, § 445; Moor v. Moor (Tex. Civ. App.) 63 S. W. 347; Eldridge v. Eldridge (Tex. Civ. App.) 259 S. W. 209; Guerro v. Guerro (Tex. Civ. App.) 213 S. W. 360; Wagley v. Wagley (Tex. Civ. App.) 230 S. W. 493; Crane v. Deacon (Mo. Sup.) 253 S. W. 1068; Dowdle v. U. S. F. & G. Co. (Tex. Com. App.) 255 S. W. 388.

In the case of Schwingle v. Keifer (Tex. Civ. App.) 135 S. W. 194 (affirmed 105 Tex. 609, 53 S. W. 1132), it is said:

"The general public is vitally interested in the status of the man and woman living together as man and wife, or in some disreputable relation, so as to govern their conduct socially towards them, and protect decent, respectable society from contact with vile associates."

The same thought is expressed in 9 R. C. L. § 11, p. 252, where it is said:

"Marriage is a relation in which the public is deeply interested, and is subject to proper regulation and control by the state or sovereignty in which it is assumed or exists."

In Grigsby v. Reib, 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011, Mr. Chief Justice Brown quoted the following language of Chief Justice Hemphill in the case of Sheffield v. Sheffield, 3 Tex. 86:

"The nature, object and important purposes of the contract should have their just influence upon the mind. The parties have pledged themselves, not only for their own happiness, but for purposes important to society, to live together during the term of their natural lives. This engagement is the most solemn and important of human transactions. It is regarded by all Christian nations as the basis of civilized society, of sound morals, and of the domestic affections; and the relations, duties, obligations and consequences flowing from the contract are so important to the peace and welfare of society as to have placed it under the control of special municipal regulations, independent of the will of the parties. The mutual comfort and happiness of the parties are the principal, but not the only, objects of the engagement. It is intended, also, for the benefit of their common offspring, and is an important element in the moral order, security and tranquillity of civilized society."

Hence it is that the courts will not look with favor upon the application of parties who desire to avoid the binding force of a divorce decree for some personal benefit to themselves. As said in the case of Johnson v. Johnson, 182 Ala. 376, 62 So. 706:

"A decree of divorce, though procured by the collusion of the parties, is not therefore void, and neither of the guilty parties is entitled as of right to have the decree set aside on that ground. 'By the weight of authority a divorce obtained by collusion between the parties is binding on both and may be impeached by neither.' 14 Cyc. 717 (II). Though, on the ground of public policy, it is said to be the better rule to set aside a collusive judgment, if the application be seasonably made in good faith and not from any expected personal advantage. 15 Cyc. 718, note 46, citing the authorities. But in general courts will not entertain such an application when made by the successful party who had knowledge of the proceeding and who, after the death of the former spouse, is thereby seeking some purely personal advantage."

Indeed, we do not understand from the brief of appellant that in the face of the authorities we should disregard the force of the divorce decree, but the insistence in behalf of appellant rather is that after the decree there was a valid common-law marriage between appellant and Maggie De Beque, which confers upon appellant all of the rights of a husband under our statutes of descent and distribution. Because of the unsettled conditions and the want of available civil authorities to authenticate marriage contracts in the early settlement of this state, our courts have frequently given binding effect to agreements to marry followed by cohabitation and mutual recognition as husband and wife. As the necessities for the rule, which was one of the common law, have failed, it may be questioned whether in the state of our present civilization the rule itself should longer receive any recognition whatever. But however this may be, the courts closely scrutinize marriage contracts of the kind when asserted. In the case of Reed v. State, 95 Tex. Cr. R. 492, 255 S. W. 619, our Court of Criminal Appeals in affirming a conviction in a case defended on the ground that there was a written agreement to become husband and wife, followed by cohabitation, had this to say:

"The evidence shows a cohabitation between her and Hay unquestionably, but, under the authority of Grigsby v. Reib, cited in our former opinion, this would not be enough. As we understand that case, there must be not only an agreement to become husband and wife with subsequent living together and cohabitation, but also that such cohabitation and living together must be 'professedly' (as that opinion puts it) as husband and wife."

In the case of Berger v. Kirby, 105 Tex. 611, 153 S. W. 1130, 51 L. R. A. (N. S.) 182, our Supreme Court approved a charge in part as follows:

"A common-law marriage exists when a man and woman enter into an agreement to become husband and wife, and, in pursuance of such agreement, do live together and cohabit as husband and wife, and hold each other out to the public as husband and wife."

In Bell v. Southern Casualty Co. (Tex. Civ. App.) 267 S. W. 531, writ refused, the court, after referring to the two essentials of common-law marriage, to wit, the agreement to marry and cohabitation as husband and wife, said:

"Applying this rule, the proof offered by appellee for the purpose of showing a common-law marriage between appellant and Joseph Cole in the state of Louisiana fell short of establishing that relation, because there was no proof in this case to the effect that there was ever any character of agreement between appellant and Joseph Cole to live together as man and wife during their natural lives. True, as we have stated, the proof showed several years of living together and cohabitation, but this is only one of the essential elements of a common-law marriage in this state."

See, also, Cuneo v. De Cuneo, 24 Tex. Civ. App. 436, 59 S. W. 284.

(286 S.W.)

In the case of United States. Fidelity & Guaranty Co. v. Dowdle (Tex. Civ. App.) 269 S. W. 119, the parties began living together while Lucius Dowdle was still married. There was no proof of a subsequent agreement or contract of marriage between the parties, though such cohabitation continued after the divorce, as before, and up until the death of Lucius. The court denied Mary Dowdle judgment as the surviving wife of Lucius Dowdle, saying, among other things, that:

"No valid agreement creating the relation of husband and wife between appellee and deceased, Dowdle, having been shown to have been made after the removal of the impediment existing to deceased, Dowdle, the cohabitation by said parties thereafter was not as man and wife in continuance of a marriage contract. as 'it can of itself be no part of the marriage contract except it take place after and not before the agreement.'"

Chief Justice Fly, of the San Antonio Court of Civil Appeals, in the case of Schwingle v. Keifer, 135 S. W. 194, affirmed by the Supreme Court in 105 Tex. 609, 153 S. W. 1132. in treating the subject, said:

"In order, however, to establish marriage by reputation there must be a consensus of opinion that the man and woman living together are husband and wife. If the community is divided as to the status of the parties—that is, if all the witnesses testify that some people thought the parties were not married, while others thought they were—a marriage could not be sustained. But if some witnesses testified that the whole community thought the parties were married, and others swore that the whole community thought they were not married, a question of the credibility of the witnesses would arise, which should be solved by a jury."

In Re Hilton's Estate, 263 Pa. 16, 106 A. 69, the court said:

"The evidence of reputation as husband and wife is contradicted by a number of witnesses, whose testimony was that, while the parties lived together for a number of years, the general reputation was that they were not married. The mere fact that they were known to a few people as man and wife is not sufficient evidence to establish marriage. Proof of reputation for such purpose must be general and not confined to a few persons in the immediate neighborhood, as the relation may be established merely for the purpose of deceiving others."

In the case of Lockwood v. Lockwod, 220 Mich. 124, 189 N. W. 871, the plaintiff, a widow, began to keep house for the defendant, a widower. They visited another town and returned to the place of their residence, announcing that they were married, and thereafter lived together as husband and wife. The plaintiff was introduced at home and among relatives and at other places as the wife, the relation being accompanied by other incidents to the married life of the man and woman. The plaintiff, however, continued to draw a pension as a widow from the pension department at Washington, this being the only respect in which the holding out of husband and wife was not complete. The court on appeal reversed a decree granting the alleged wife a divorce, holding that there was no marriage, saying:

"We are convinced from this record that plaintiff desired to maintain a dual existence, wife of defendant in the community where she lived, widow of a war veteran in the Pension Department at Washington. Each three months she filed in the pension office her affidavit that she was a widow and had not remarried. Less than a week before the hearing in the court below she drew her pension for three months as the widow of James Johnson, and she now asks this court to cover her relations with defendant with the charitable mantle of a common-law marriage, and give its sanction to a Dr. Jekyll and Mr. Hyde existence. We must decline upon this record to do so."

Other authorities of like tenor and effect are cited in the brief of the able counsel for appellees, but we think the quotations given by us sufficient to show that it cannot be said that the proof in this case establishes a common-law marriage between Frank and Maggie De Beque after the decree of divorce in 1905. True there was evidence to the effect that they lived and cohabited together, and that it was understood among some of their associates and people with whom they dealt that they were husband and wife, but it is by no means uniformly so. We find in many if not in most important respects, Maggie De Beque acting as a feme sole, asserting in solemn instruments, such as her income tax returns, that she was an unmarried woman, there also being evidence raising the inference that Maggie De Beque had retained at least a degree of affection for her divorced husband and desired to care for him. The other circumstances attending their living together seems as attributable to illicit connection as to the lawful relation of husband and wife.

[12] Several incidental questions should be disposed of. The testimony of Frank Ligon relating to Maggie De Beque's statement in her income tax returns that she was a single person or feme sole was objected to on the ground that it was a self-serving declaration, a declaration in derogation of the title of the property involved in this suit by one of the parties to the transaction before she died, and is hearsay testimony, and because the answer had been reduced to writing and the writing was the best evidence of its contents. We think this testimony was admissible, inasmuch as what the parties to the alleged common-law marriage did and said and how they held themselves out to the public was a material inquiry relating to that issue; it was made at a time when no thought of its effect upon the rights of the parties as now placed could have been in mind. It was in a writing which the proof showed had been for-

warded to the internal revenue authorities of the United States, and therefore without the power of the court to produce, and, moreover, the witness stated that the original copy had remained in his possession and was apparently before the court.

[13] The testimony of R. W. Fender to the effect that in the latter part of October, 1923, Frank De Beque presented and had cashed a check issued by Maggie De Beque for $23,000 was objected to on the ground that the check had not been put in issue by the pleading; that defendants were not seeking to recover on the check; that the witness' answer would not be material and would be prejudicial to plaintiff's cause. We do not think the objections material or the evidence prejudicial. It would seem that the inferences therefrom are as favorable to appellant as to the appellees. Therefrom it may be inferred that Maggie De Beque recognized that appellant had an interest in the ranch that was sold which she thus sought to account to him for. It was a mere incident of their dealing together, and the inference therefrom to be drawn was for the jury, we think, and at all events, the error, if any, is not such as would require a reversal of the judgment.

[14] Objection was also taken to the exclusion of appellant's own testimony offered in his behalf, in which he detailed the statements and representations of Mrs. Morris, in whose possession May Hiller was at the time of her adoption, to the effect that she was an orphan; that appellant would not have adopted her had he known that her father and mother and relatives were living, etc.

We have perhaps already said enough on the subject of the adoption to make it apparent that no material error was committed in the exclusion of this testimony. The adopted child, now known as May De Beque, appellee here, was not claiming property owned or held by Frank De Beque, and the fact that if the adoption proceedings could be set aside as to Frank De Beque on the grounds thus sought, it certainly could not be so held as to Maggie De Beque, who also executed the instrument of adoption, and who also forever thereafter during her life recognized it and left no testamentary disposition of her property indicating that she desired her property to be vested otherwise than as the law would direct. See In re Gunn's Estate, 227 Mich. 368, 198 N. E. 983; Adoption of Bearby, 185 Wis. 33, 200 N. W. 686. The reference to the testimony we have already made we think sufficiently shows that the court committed no error in refusing appellant's special instruction No. 2, which was in effect peremptorily directing the verdict in appellant's favor.

[15, 16] Appellant also assigns error to the court's refusal to give his special instruction No. 3, which embodies a definition of a common-law marriage less restrictive than the one given by the court, but as to this we think it sufficient to say that the record fails to disclose that this special charge was "refused" and signed by the trial judge as required by the rules, and nothing in the record save the recitations in the charge itself shows that it was ever presented to the trial judge. The error assigned cannot, therefore, be sustained, to which we will add that the court's charge on the subject does not appear to have been excepted to, and which, moreover, we think under the authorities is substantially correct.

[17, 18] Finally error is assigned to the action of the court in overruling appellant's second amended motion for new trial, on the ground that the jury in their deliberations discussed and considered a purported partition and settlement of the rights of plaintiff and defendant of the property involved in the suit, and considered what effect their verdict might have on the division of the property, and considered in this connection the fact that appellant had received $23,000, and concluded that this amount was a settlement of whatever claim plaintiff may have had in the property or on Mrs. De Beque, and concluded that the plaintiff ought not to get any more property, and that all involved in this suit should go to May Hiller or De Beque, and on the ground of newly discovered evidence. The judgment in this case was rendered on the 15th day of April, 1925. On April 13th appellant filed his original motion for new trial. On May 2, 1925, he filed his first amended motion for new trial, and on May 21st his second amended original motion for new trial, which the court overruled, and in which appellant, for the first time, asserts the grounds already stated. In an explanation by the court to a bill of exception taken by appellant, the court certifies that the motion had been twice amended, and that the amendment offered would have necessitated the postponement of the hearing beyond the legal time for such hearing. It would seem that the amendment was not presented within the time required by the new practice act. See article 2092, §§ 28, 29, and 30, Rev. Civ. Statutes 1925, which is applicable in this case. Pierce v. Watkins, 114 Tex. 153, 263 S. W. 905; Box v. Pierce (Tex. Civ. App.) 278 S. W. 226; Cunningham v. Gaines (Tex. Civ. App.) 176 S. W. 148. Moreover, we do not understand that a jury's verdict may be impeached on the ground that they may have in argument drawn conclusions which perhaps the court would not have approved and to which the court certainly gave no effect. The motion was not verified, and the alleged newly discovered evidence set up in the motion was contained in the affidavits of Ike Epstein, Ed Jenkins, William T. Brown, S. B. Murray, and Lee F. Thomas.

The testimony of Ike Epstein, as set forth in his affidavit, goes more minutely into the details of the intercourses between Maggie and Frank De Beque than any other witness-

es. He testified to the effect that he was in the employ of Frank De Beque as a barkeeper for several years during the time of the operation of the Standard Theater, and conversations, acts, and managements of these parties was such as usual between husband and wife, and that they were so regarded by him and others with whom he associated. The other witnesses' testimony was of the same general nature. Ed Jenkins and Lee Thomas were musicians in the Standard Theater; W. T. Brown well knew the parties and was more or less intimate with them; Murray threshed wheat on the farm, and there had many conversations with the parties. It may be admitted that all of the testimony so sought was of equal force and effect as that of Ike Epstein, but their affidavits were verified shortly previous to the filing of the motion for new trial, which, as stated, was on May 21, 1925. The affidavits plainly show that the parties were employees and intimate acquaintances of appellant, and we think no sufficient reason is shown why this evidence was not discovered earlier. It was alleged in the motion that the respective witnesses knew the facts detailed by them, and that such facts were unknown to the plaintiff or to the attorney until the date of the making of the affidavits. It was further represented that the plaintiff was more than 70 years of age, also deaf, so that conversations were very difficult; that he was reserved; that much of evidence set out in the affidavits had occurred many years ago, and the names and addresses of some of the witnesses were now unknown to him. But, as stated, the motion was not verified by any one, and it appears to us there was a want of diligence in procuring the testimony. Choate v. McIlhenny, 71 Tex. 119, 9 S. W. 83; Austin Electric Ry. Co. v. Faust, 63 Tex. Civ. App. 91, 133 S. W. 449; Russell v. Oliver, 78 Tex. 11, 14 S. W. 264; Pride v. Whitfield (Tex. Civ. App.) 51 S. W. 1100; Houston Lighting & Power Co. v. Hooper, 46 Tex. Civ. App. 257, 102 S. W. 133. We might add that the purported newly discovered testimony was largely cumulative of that already offered by appellant on the trial, and had it been admitted it may be seriously questioned whether under the authorities already cited relating to the requirements of a common-law marriage such testimony would have affected the verdict or be allowed to outweigh the many acts of Maggie De Beque of a contrary effect evidenced by her frequent execution of formal deeds of conveyances, income tax returns, etc.

We finally conclude that all assignments of error and propositions thereunder should be overruled and the judgment affirmed.

### On Motion for Rehearing.

[19-24] In deference to the very earnest appeal of counsel for appellant, we will notice a question not heretofore presented. It is now insisted that the record shows, as it seemingly does, that the property in controversy was accumulated during the marriage and association of Frank and Maggie De Beque, and that the articles of adoption operate as an estoppel which will preclude May De Beque from claiming that Frank and Maggie De Beque were not husband and wife, or at least that said articles should be construed as a contract between the three parties named, to the effect that upon the death of Maggie De Beque, dying intestate, Frank De Beque would be entitled to a husband's share of the property left by her. We are not inclined to suppress a feeling of sympathy for Frank De Beque under the circumstances, but we cannot bring ourselves to the conclusion that he may now be given relief on the theory suggested. It is true that the articles of adoption described Frank and Maggie De Beque as husband and wife, but May De Beque at the time was a minor of tender years, and no plea of estoppel in behalf of appellant was presented on the trial below, and it is well settled in the authorities that in order to take advantage of estoppel, by deed as well as in pais, the party so attempting to rely thereupon must plead it. See Murphy v. Lewis (Tex. Civ. App.) 198 S. W. 1059; Smith v. Roberts (Tex. Civ. App.) 218 S. W. 27; Erickson v. Wiper, 33 N. D. 193, 157 N. W. 592; Gilson v. Nesson, 208 Mass. 368, 94 N. E. 471. Moreover, appellant, instead of relying in any manner upon the articles of adoption, attacked the same and sought in his pleadings and evidence to set it aside entirely. It has been held that a person may not seek to destroy an instrument and at the same time insist that the other party is bound by its terms. See Crosby v. Chase, 17 Me. 369. The suggestion last made would seem also to preclude a finding on our part that the articles of adoption should be construed as a contract entitling appellant to the share of a husband in the property of his deceased wife, as provided by our statutes of descent and distribution. No process of legal reasoning can support the conclusion that appellant may by his pleadings and evidence seek to destroy the effect of the articles of adoption and avoid it altogether and at the same time insist that it shall operate as against another party, beneficially interested therein as a contract. Moreover, it seems evident that the articles of adoption cannot correctly be construed as an agreement binding upon all the parties to it that the property involved shall be distributed as suggested. Nothing in the articles indicates that the purpose of its execution was to provide for the disposition of the property; its evident purpose was to accomplish the legal adoption of the minor child now known as May De Beque. The only reference to property to be found in the instrument is the concluding statement that:

"The said child (May De Beque) shall share our property as provided by the laws of Texas."

Under the laws of Texas, in the absence of a devise on the part of Maggie De Beque, Frank De Beque can be given any right of title to property owned by Maggie De Beque at the time of her death only on the theory that he in fact was her husband at the date of such death, and such relation has been denied him by the verdict and judgment below.

[25] Appellant again presses upon us the contention that the court below should have granted a new trial on the ground of newly discovered evidence, but we feel we must adhere to our conclusion on this subject, as originally announced, as it seems to us legal diligence was not shown on appellant's part to ascertain the additional testimony presented in the affidavits attached to his motion. As pointed out, these parties were employees and intimate acquaintances of appellant, and it seems to us that proper diligence would have suggested to appellant at once to make an effort to procure such witnesses, it not appearing that their whereabouts were unknown, or that they were nonaccessible. Moreover, it may be doubted, in the light of the authorities cited in our original opinion, that had their testimony been introduced, it would have been sufficient to overcome the other testimony tending strongly to show that after the divorce of Maggie and Frank De Beque she in many instances and to many persons represented herself to be a feme sole.

We conclude that the motion for rehearing must be overruled.