**RODRIGUEZ et al. v. TEXAS EMPLOYERS' INS. ASS'N et al.**

No. 9479.

Court of Civil Appeals of Texas. Galveston.

Dec. 18, 1930.

Rehearing Denied Jan. 22, 1931.

deceased, under a policy of insurance issued by the appellee association in compliance with the provisions of the Employers' Liability Act of this state (Vernon's Ann. Civ. St. art. 8306 et seq.) to the Houston Transportation Company, the employer of the deceased.

Appellant Concha Mendez, who was claiming to be the common-law wife of the deceased and the right to the compensation due under the insurance policy, was made defendant by the petition.

The defendant Concha Mendez answered by cross-action against the plaintiff and the defendant insurance association, claiming compensation under the policy of insurance as the common-law wife of the deceased.

The defendant insurance association answered the petition of each of the claimants by a general demurrer and a general denial.

The plaintiff answered the cross-action of Concha Mendez by a general demurrer and a general denial.

The cause was submitted to a jury upon special issues.

In response to the issues submitted to it, the jury found: That the injuries which caused the death of Gregorio Rodriguez arose out of, and were received by him in the course of, his employment; that plaintiff, Maria Rodriguez, was not dependent upon her brother, Gregorio Rodriguez, for her support; and that Concha Mendez was not the common-law wife of Gregorio Rodriguez at the time of his death.

Upon return of this verdict, judgment was rendered in favor of defendant insurance association against each of the claimants under the policy. Each of these claimants has appealed against the other and the insurance association.

■ The first assignment presented by the brief of plaintiff, Maria Rodriguez, complains of the finding of the jury that she was not partially dependent upon her brother for support, on the ground that such finding "is contrary to and unsupported by the entire testimony, or by any of it." The proposition presented under this assignment complains of the verdict on the ground that it is "against the overwhelming weight of the evidence."

The proposition presents a different question from that raised by the assignment upon which it is based, which only raises the issue of whether there is any evidence to support the verdict, and we, under well-settled rules of decision by our Supreme Court, could, because of this difference between the question raised by the assignment and that presented by the proposition, refuse to consider either. The assignment is not required to be considered because it is not followed by a proposition presenting the issue raised by it, and

Fitzpatrick & Sargent, of Houston, and David E. Hume, of Eagle Pass, for appellant Maria Rodriguez.

Barkley & Webb and W. K. Richardson, all of Houston, for appellant Concha Mendez.

Morris, Sewell, Taylor & Morris, of Houston, for appellee Texas Employers' Ins. Ass'n.

PLEASANTS, C. J.

This suit was brought by Maria Rodriguez against the appellee insurance association to recover compensation claimed to be due her as a dependent sister of Gregorio Rodriguez,

the proposition can be ignored because it is not germane to any assignment contained in the record.

We have, however, considered the proposition, and find from an examination of the record that the evidence is sufficient to support the finding of the jury that plaintiff was not dependent in whole or in part upon her brother, Gregorio Rodriguez for her support.

The evidence shows that the plaintiff, who is 35 years old, lives in the suburbs of the city of Guerrero, Mexico. She, Gregorio, and another brother, now deceased, inherited a farm or ranch of 30 or 40 acres upon which she and the widow of her brother who died in Mexico eleven years ago reside. She and her brother Gregorio jointly owned a few cows which are kept on this farm. Her uncle, who is the father of her sister-in-law, and lives near her, testified:

"Since the time my daughter married Maria Rodriguez's brother Maria has lived close to where I live, lived with us. She never paid any board but received the same treatment as my own daughter did. I am Maria's uncle and I take care of her in the same way I take care of my daughter or any other member of my family. Whenever Maria needed anything like clothes or anything like that all she or the others had to do was to ask me. I would take them to Piedras Negras and buy their shoes or anything they wanted. This continued over a period of 17 years. Maria was never sick during that time, but at any time she wanted any food or clothing and asked me for it I furnished it to her. * * * Maria worked around my household and my farm and done the same labors as any of the other members of my family performed; she did the same as all of my family. The same as if she was my daughter or any of my family. That continued over a period of 17 years. * * *

"I had lived with Maria Rodriguez and have lived with her since her other brother died about eleven years ago. They lived on a farm. The residence belongs to Maria Rodriguez. She is a part owner. It is a big family and all of them own a part of that land, including Maria. It is a ranch of about 30 or 40 acres. They have about 20 head of cattle on that ranch. The stock belongs to the dead man, Rodriguez, and to his sister, Maria. Stock is all they have on the ranch but, of course, they grow corn, wheat and cotton on it. I am administrator and take care of everything that is raised on that ranch. There is no store on this ranch. Maria Rodriguez doesn't own a store. They buy $200.00 or $300.00 worth of groceries at a time and divide it up. Maria is the one that takes care of distributing the groceries and she is the one receives the money after they collect it."

On cross-examination this witness further testified that at times he had been mayor of the city of Guerrero, and that he and plaintiff, Maria Rodriguez, belonged to one of the outstanding families of the town and lived as well as anybody in the town; that Maria lived just as his family lived and was one of the outstanding women of the town.

The deceased, Gregorio Rodriguez, came from Mexico to Texas, where he has continuously resided for the past seventeen years, during which time he has made three visits to his old home in Mexico. At the time of his death on October 24, 1928, he was earning $3.50 per day.

In support of her testimony that her brother Gregorio sent her money at various times "from $25.00 down," sometimes once a month and sometimes once in two or three months, which she used to "buy clothes and things," the plaintiff introduced four letters from Gregorio of date January 18, 1927, April 2, 1927, March 18, 1928, and July 2, 1928, respectively. In the first of these letters he says that on the 24th of the preceding December he had sent the plaintiff $26 "Christmas," and that he has not heard whether she received it, and asks her to let him know if she needs more money. In the second letter he inclosed $10 "in case it may be able to help" her. In the third letter he tells her that, if she will send him some patterns, he will have some clothes made for the children, but, if she cannot do this, he will send money with which to buy the clothes.

There is no testimony that plaintiff, who was unmarried, had any children of her own, and it is a fair presumption that the children mentioned in this letter were those of the widowed sister-in-law who lived with the plaintiff.

In the fourth letter he writes plaintiff and incloses $10 to buy clothes for the children of "Rakila," and advises her that he understands that she has some trouble with her eyes, and that she can sell his cows in order to cure herself, and, if she will not do that, to let him know and he will send her money.

The witness Dora Bozeman, who testified for plaintiff that she wrote letters for Gregorio to his sister and also sent money to his sister for him, "sometimes every month and sometimes every two or three months," further testified: "The sister was named Maria Rodriguez. That is her setting over there; sometimes he would get a letter from his sister and say they need money; one time said somebody going to get married and wanted fine clothes, fine silk dresses and stockings and shoes, but I don't know if it was in a month or two weeks, I don't remember that, Big Boy was a neat dresser himself; he wear fine clothes."

Plaintiff testified that the moneys sent her by Gregorio were transmitted by checks, or little green papers which were called checks

in Mexico, but she did not know whether they were checks or post office money orders.

The president of the Houston Transportation Company, Gregorio's employer, testified: "Gregorio did tell me that he sent money home to pay his taxes; he called it a ranch that he had and said he had some cows there, and he sent money once in a while to pay his taxes and keep his cows through the winter. I don't know so much about his telling me that he sent that money down there to his sister for that purpose. I'll tell you that I was always under the impression that they had a pretty good tract of land there. I don't know how many cattle they had but he always spoke of it as a ranch and he sent money home once in a while and I don't know any more than just that he said to help keep up the ranch. I don't think Big Boy sent a lot of money home at any time but he did tell me he had to send some down there to pay his taxes and keep up his ranch and keep up his cattle."

While there was evidence from which the jury might have found that the plaintiff looked to and partially depended upon her brother, Gregorio, for her means of support or living in the state of life to which she was accustomed, the finding to the contrary is not so against the great weight and preponderance of the evidence as to authorize this court to disturb it.

■ All of the evidence shows that Gregorio was an affectionate and thoughtful brother and frequently made gifts to plaintiff, and she has doubtless suffered financial loss because of his death, but these facts are not sufficient to require a finding by the jury that the sister was dependent in whole or in part for her support upon the contributions or gifts of her brother. For a recipient of gifts to become a dependent upon the giver in the purview of our statute, such gifts or contributions must in a substantial way aid the recipient to live. Oilmen's Reciprocal Association v. Gilchreas (Tex. Civ. App.) 283 S. W. 633; Howard on Workman's Compensation, vol. 1, p. 234, and footnote on page 237.

The testimony of plaintiff's uncle before set out is sufficient in itself to justify the conclusion of the jury that plaintiff was not dependent upon her brother for her support, and when we add to this the testimony of the other witness tending to show that the specific remittances of money shown to have been made plaintiff by the deceased were largely made for taxes and care of property owned jointly with his sister, and occasional gifts to the plaintiff for her use and enjoyment and that of other members of their family on special occasions, it cannot be held that the finding is so against the great weight and preponderance of the evidence as to require or authorize an appellate court to set it aside.

■ Plaintiff's second assignment complains of the charge of the court submitting the issue of dependence. This charge is as follows: "You are instructed with respect to Special Issue No. 3 that to constitute one a dependent of another the contributions, if any, must be substantial as distinguished from trivial. One may be dependent on another although the beneficiary is not destitute or wholly dependent; but if contributions of one to another are made reasonably substantial, having in mind the condition of the parties and other circumstances, and are received and relied upon by the beneficiary in meeting the needs of the beneficiary, and are not merely occasional gifts, then such condition would constitute the beneficiary a dependent."

No written objection to the charge was presented to the court, but a bill of exception approved by the court after the return of the verdict shows that the attorneys for plaintiff verbally excepted to this charge "because the court submitted the issue on dependency, not including partial dependency." The language of the charge just quoted is a complete answer to this exception. The jury were expressly told by this charge that plaintiff might be found dependent on the deceased although she was shown to be not "wholly dependent." Clearly such submission does include partial dependency.

■ The second proposition under this assignment assails the ruling of the court in refusing to give a charge upon the issue of plaintiff's dependency requested by her. This charge need not be set out. It is sufficient to say that it is so argumentative and so manifestly upon the weight of the evidence that it should not have been given to the jury, and the trial court correctly so ruled.

■ By her third and fourth propositions plaintiff complains of the action of the court in receiving the verdict of the jury in the absence of the plaintiff, and her attorney, thereby depriving her of her right to have the jury polled on the verdict; and "in refusing to set aside the verdict because it was made to appear to the court that the jury misconstrued the court's charge on the question of dependency, said special issue having been objected to on the ground that it failed to include the element of partial dependency and it being made to appear also to the court that the jury agreed to the verdict with misgivings."

There is no merit in either of these complaints. The bill of exceptions preserved by plaintiff on the first of these complaints shows that "the case had been on trial for five days; that the hours throughout the trial for the noon recess from Monday to Friday, inclusive, were from 12 o'clock noon to 2 p. m. There are no recess hours on Saturday afternoon because if the judge of the court is working on Saturday he works until he can get away, and if he has work that carries him through the lunch hour, he stays. That the above

case was concluded on Saturday, the case being submitted to the jury just before noon; that no time was fixed for the Court to reconvene. That Mr. Sargent, one of the counsel for Maria Rodriguez, testified that he relied on the custom of recessing until 2 p. m. That there was no other testimony given on this point. That the court received the verdict at 1:45 p. m. and discharged the jury. That counsel for Maria Rodriguez was not present in court, and for this reason had no opportunity to poll the jury. That Mr. Sargent, one of the attorneys for Maria Rodriguez, stated that he was at lunch at the time the jury returned its verdict. Mr. Hume, the other attorney for Maria Rodriguez, left on the preceding Friday night for Eagle Pass and was not in the City of Houston on Saturday, but as above stated, he left for Eagle Pass on the preceding Friday and left the case in charge of Mr. Sargent and Major Fitzpatrick."

It has been expressly ruled that the return and acceptance by the court of a verdict in the absence of a party to the suit and his attorney affords no ground for attack upon the verdict, for the obvious reason that there is no statute or rule of procedure requiring the parties or their attorneys to be present when the verdict is returned. Lawrence v. Copper Co. (Tex. Civ. App.) 237 S. W. 959.

There is nothing in the facts stated in the bill of exceptions which tends in the least to indicate that appellee did or said anything to mislead appellants' attorney and prevent his presence when the verdict was returned, and the court in accepting the verdict at the time it was returned was following a well-known rule or custom of the court.

■ The second of these complaints presents no valid ground for impeachment of the verdict. As we have before said, the charge of the court clearly included the issue of partial dependency, and could not have reasonably misled the jury, and the fact that some or all of the jury may have had misgivings as to the verdict cannot affect its validity. Especially is that true in a civil case where the issues must be determined by a preponderance of the evidence, and not, as in a criminal case, beyond a reasonable doubt. Hermann v. Schroeder (Tex. Civ. App.) 175 S. W. 788; Twichell v. Klinke (Tex. Civ. App.) 272 S. W. 283.

In addition to several assignments and propositions presented in the brief of Concha Mendez complaining of rulings of the court upon the admission of evidence objected to by her, the main complaint, which we will first dispose of, is that the trial court should have instructed the jury to return a verdict in her favor on her claim that she was the common-law wife of the deceased at the time of his death.

■ We think the preponderance of the evidence supports the finding of the jury that Concha Mendez was not the common-law wife of Gregorio Rodriguez. Concha testified: That she had lived with Gregorio as his wife for two or three years before his death, that they occupied the same room and bed in a house which they had rented on Meek street in the city of Houston, and that he paid for the groceries and vegetables which she ordered for their use. "He loved me and I loved him. He talked to me that he loved me, and I loved him. I tell him that he is my husband and that I like him. That was in 1925. I am asking for the money in preference to his sister, because he is my husband. He, speaking of deceased, paid somewhere around $40.00 to $50.00 a month for lights, groceries, and general household expenses. Sometimes he would give me the money with which to pay it. At other times would buy it himself. He also bought all my clothes, but I can't figure what that would amount to. He kept that up right along from the time he commenced living with me until he was killed."

Mr. Kalb, from whom she rented the house she occupied on Meek street, testified: "That she started renting from him on or about the 15th of August, 1927; that he first met the deceased when they rented the house in August, 1927; that when she came to look at the house and said she liked it, and if her husband liked it she would rent it; that she would show the house to her husband on such and such a day, but she said for him to come to her house on the next day, I believe it was, and I went out there and she says: 'My husband like that,' and he said he liked the house and he gave me $10.00."

Five or six other witnesses testified to facts tending to corroborate her statements that she and Gregorio were at the time stated by her living together as husband and wife. Several of these witnesses testified that Gregorio and Concha occupied the same room in the house in which Concha lived, and two or three of them testified that Gregorio spoke of Concha as his wife. Two of these witnesses were dealers in supplies, and testified that Gregorio told them Concha was his wife, and that he would pay them for groceries and vegetables sold her. The vegetable dealer stated that Gregorio did pay him for vegetables sold to Concha.

Frank (Poncho) Najar testified: "That he had known the deceased over two years before his death; that the brother of Concha introduced the deceased to him as his brother-in-law, and that the deceased introduced Concha to him as deceased's wife; and that the deceased told him if Concha needed any money while he was out of town to loan it to her and he would pay him when he came back. He spoke of Concha as his wife."

After Gregorio had died from his injuries, Concha wrote the plaintiff, Maria Rodriguez, the following letter:

"Houston, Texas, Oct. 1928.

"Sra. Maria C. Rodriguez

"Senorita: She who write you is a woman who lived with your brother Gregorio. Know you that while at work he was hurt and it was useless trying to save him. I, since we were not married, can do nothing. They do not want to deliver his body to me until they hear from you."

Mr. McAughan, under whom Gregorio worked, testified: "I have had a conversation with Concha Mendez, the little girl you point to there. She came over there to our yard and I went over to her house a couple of times. Concha told me that Poncha Najor was her husband, and she had a little girl there about this high and said it was her little girl. Poncha Najor is also known as Frank Poncha. I always called him Poncho. I know him when I see him and I saw him outside of the courthouse today. Both he and Concha Mendez have told me that he, Poncho, was her husband. Concha never did tell me that she was married to Gregorio Rodriguez. If Gregorio Rodriguez was ever married I did not know it."

The witness further testified: "It was after Big Boy (Gregorio Rodriguez) got killed that I went over to Concha's house; I think I went over the same day, maybe the next, and this big fellow (Poncho) was there. * * * He (Gregorio Rodriguez) stayed in camp most of the time; as long as we had a camp he stayed right in camp all of the time. As to whether he came into town Saturdays and Sundays, why I didn't keep up with him, but most generally Gregorio worked all the time. He worked in the oil field a whole lot. * * * I know this man Poncho. All I know about him is I just saw him twice or three times. I do say that he told me Concha Mendez was his wife. And he had a little girl over there and said that she was his little girl by her, and then Concha has told me the same thing. What Poncho said about his wife not having anything to do about trying to collect this insurance is this. I was over there and he said something about he was not going to have any thing further to do with it —that was when this woman (he pointed to Maria) was here; that he was tired of it. * * * I do not know how long Gregorio Rodriguez had been living at Concha's house, boarding out there or staying out there, but think he must have been there seven or eight months. I don't think he was there much longer than that and it may have been a little less or a little more. He had made his home with Frank Bozeman all the time up until we started this job at the market known as the Farmers' Market. He had always lived and made their place his home, wherever they were; wherever you found them you found him. * * * I have never seen Big Boy out with any woman except Frank Bozeman's wife when he lived with them, and he lived with them practically all of the time until the time we started to work on the market. I don't think he lived with anybody else up to that time. When I speak of Big Boy I have reference to Gregorio Rodriguez. They started work on the Farmers' Market about seven or eight months before the deceased was killed. * * * Big Boy lived out at Frank Bozeman's place just like he was at home. He cooked a lot for them when they were boarding men. He was just like one of the family."

Enrique Delgado, a witness for plaintiff, testified, in substance, that in March, 1928, he took Gregorio, who was in search of a room and board, to Concha's boarding house on McKee street, and introduced him to Concha, and that Gregorio got a room there with another boy.

Brazilliano Adame testified: That from May, 1928, until Gregorio's death they occupied the same room in Concha's boarding house, in which each had a bed, that he and Gregorio worked together on the "new market" job, and that his boarding house was too far from his place of work and that Gregorio proposed to him to come to his boarding house. "I went to interview Concha Mendez because Gregorio had told me he was paying six and a half dollars a week, and when I talked to Concha she wanted eight dollars, and I told her no, that I only received three and a half a day and consequently that was too much. So is was arranged then that I would sleep in the same room with Gregorio and pay the same amount that Gregorio paid. I made the arrangements with Concha. * * * I have never seen Gregorio take Concha Mendez to a picture show, or have I ever seen him take her to the grocery store on the corner. Gregorio always slept in his own bed at night, not in Concha's bed. I paid my board money to Concha Mendez, and sometimes I have seen Gregorio pay board money to her, but it is impossible for me to remember how many times, but I will say it was more than five times. It was $6.-50 Gregorio would pay to Concha. Sometimes when we were both together we would both pay her. I have never seen Gregorio give Concha his pay check. * * * Gregorio Rodriguez never told me he was married. He and I have talked about many things in confidence but that was never told me. Many times though Gregorio has told me that he was not married. * * * Many times while we were working we talked about things such as marriage. Gregorio would ask me if I was married and I told him I was not, and I would ask Gregorio if he was married and he would tell me that he was not. Many times during our work we had conferences like that. * * * After knowing Gregorio ten years more or less I am of the opinion that he was not married. I do not remember the date in 1928 when Gregorio

told me he was not married because we were then at our work and it was impossible for me to say."

It was admitted on the trial that Gregorio was not the father of Concha's child, a girl several years old.

Ramon Lopez testified that he had known Concha Mendez since he came to Houston about six years before the trial; that when he first knew her she was at Frank (Poncha) Najar's place where there was a dance hall; that she ran away from there with another fellow, and moved over to Preston or Louisiana street; that he and she were good friends; that he does not know the name of the street in which she has been living for the past two years, but thinks it is called Meek street; that he knows Concha has a child, but does not know its father; that he had seen Concha and Poncha Najar in bed together many many times, and that he sees him at Concha's home every day.

It is unnecessary to further incumber this opinion with quotations from the testimony. It is sufficient to say that other witnesses whose credibility was not attacked testified to many circumstances tending to refute the claim of Concha Mendez that she and Gregorio agreed to lived together as husband and wife, and did so live during the last two or three years of his life. This testimony, which the jury could have reasonably accepted as true, is to the effect that the boarding house which was conducted by Concha during the last two years of Gregorio's life was in fact a house of prostitution, and that Concha was conferring her sexual favors upon a number of men. It is not material that there is a seeming contradiction as to the name of the street upon which the boarding house is situated, as all the evidence identified it as the house in which Concha had lived for the two years immediately prior to the death of Gregorio.

In this state of the evidence it seems to us that the dictates of reason and considerations of social morality uphold the finding of the jury that there was no honest sincere contract of marriage between Concha and Gregorio which they continued to recognize and endeavored to faithfully perform. This is the only common-law contract of marriage which our courts have recognized and enforced.

█ There is no merit in the contention of Concha Mendez that the court erred in admitting the testimony as to the character of the boarding house conducted by her and as to her relations with other men during the time she claims she was the common-law wife of Gregorio. She was permitted, under the well-settled rules of evidence, in proof of her claim of a common-law contract of marriage, to show that her conduct towards and

treatment of Gregorio was that of a wife, and it would be contrary to every rule of equity and good conscience to hold that her claim of marriage could not be refuted by proof of facts wholly inconsistent with the marriage contract.

The jury having found upon sufficient evidence that neither of the claimants was entitled to the benefits of the policy sued on, it follows that the judgment of the trial court should be affirmed, and it has been so ordered.

Affirmed.