SCHWINGLE v. KEIFER et al.†

(Court of Civil Appeals of Texas. Feb. 1, 1911. Rehearing Denied March 1, 1911.)

1. MARRIAGE (§ 13*)—COMMON-LAW MARRIAGE—REQUISITES.

Where complainant testified that the first time she saw deceased was when he came to her house and proposed that she should come and live with him as his wife; that he proposed to take her to live with him as his wife, to which she consented, and lived with him until she became disgusted and "stopped being his wife," and "was not his wife from then on," the facts were insufficient to establish a common-law marriage, since cohabitation alone, not based on a prior agreement in which the minds of the parties meet on the subject of a contract to be man and wife, is insufficient to establish a marriage at common law.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 4; Dec. Dig. § 13.*]

2. MARRIAGE (§ 48*)—EVIDENCE—REPUTATION.

In cases of necessity, evidence of reputation may be given by persons not members of the family to establish a marriage.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 76; Dec. Dig. § 48.*]

3. MARRIAGE (§ 48*) — REPUTATION — WITNESSES.

On an issue of marriage vel non everyone acquainted with the parties and the repute they have in the community may testify as to the reputation of marriage or not.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 76; Dec. Dig. § 48.*]

4. MARRIAGE (§ 50*)—PROOF—REPUTATION.

In order to establish a marriage by reputation, there must be a consensus of opinion that a man and woman living together are husband and wife, evidence of reputation being insufficient if the opinion of the community is divided as to their status.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 86, 87; Dec. Dig. § 50.*]

5. MARRIAGE (§ 48*)—PROOF—REPUTATION.

It is not necessary that witnesses, offered to testify to establish a marriage by reputation, be in the same grade of society as the parties whose relations are in issue, nor that the witnesses were brought in social contact with them, if they know that the parties are living together and the reputation as to their status, since the reputation of marriage must arise where both parties reside and among those who are cognizant of their cohabitation.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 76; Dec. Dig. § 48.*]

6. MARRIAGE (§ 51*)—REPUTATION—CONFLICT OF EVIDENCE.

Where plaintiff, a Mexican, claimed to be the common-law wife of decedent, and sought to establish a common-law marriage by reputation, the court properly refused to confine the proof of reputation to that sustained among Mexicans, since if the Mexicans in the community had formed one conclusion as to the character of the relation between plaintiff and deceased, and the Americans another, both

knowing the fact of cohabitation, the evidence of both that decedent had the reputation of being a single man among the Americans and a married man among the Mexicans was admissible, and presented a question for the jury as to which set of witnesses had the better opportunity for determining the status of the parties.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 90; Dec. Dig. § 51.*]

7. EVIDENCE (§ 471*)—CONCLUSION OF WITNESS.

Where a witness on the issue whether plaintiff was decedent's wife, after testifying to her means of knowledge and observation, stated that she had never heard of plaintiff being decedent's wife, it was error to permit her to further testify to her conclusion that she probably would have heard of it if decedent had been living with plaintiff as his wife.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2149–2151; Dec. Dig. § 471.*]

8. TRIAL (§ 194*)—INSTRUCTIONS—COMMENT ON EVIDENCE.

An instruction that cohabitation and declarations of the parties that they are husband and wife do not constitute a marriage, in the absence of an agreement, express or implied, was not objectionable as a comment on the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 439–466; Dec. Dig. § 194.*]

9. TRIAL (§ 260*)—INSTRUCTIONS—REFUSAL OF REQUESTS.

It is not error to refuse requests to charge covered by instructions given.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

10. MARRIAGE (§ 52*)—INSTRUCTIONS—APPLICABILITY TO EVIDENCE.

Where, on an issue as to the existence of a common-law marriage, plaintiff testified that she went to live with decedent as his wife without any ceremonial marriage, and that after living with him for several years, she stopped being his wife and was not his wife from then on, because of his attentions to another, and it also appeared that there was an understanding between her and deceased that they would separate when either desired, and both of them acted on such understanding thereafter, an instruction that a marriage agreement, express or implied, with a proviso or qualification, made at the time of entering into it, that either or both of the parties could dissolve it at will would not in law constitute a marriage contract, was not objectionable as unwarranted by the evidence.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 91; Dec. Dig. § 52.*]

11. MARRIAGE (§ 47*)—EVIDENCE—DECLARATIONS—EXISTENCE OF MARRIAGE.

On an issue of marriage vel non, declarations of the parties as to the fact which in each instance were spontaneous, and not shown to be made for a self-serving purpose were admissible.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 75; Dec. Dig. § 47.*]

Appeal from District Court, El Paso County; A. M. Walthall, Judge.

Action by Veneranda Schwingle against C. C. Keifer and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Morris & Gillett, for appellant. Brown & Terry, for appellee executors. Robt. T. Neill, for other appellees.

FLY, J. Appellant, claiming to be the widow of Jacob Schwingle, deceased, and to own a community interest in his estate, applied to the county court for a partition of the estate, the administration of which was pending in that court. She alleged that Jacob Schwingle died on December 11, 1908, leaving a will, which was duly probated, by which he bequeathed a portion of his estate to his executor, Charles C. Keifer, to be used in maintaining a home for the aged and indigent in El Paso, $50 to a church, and the remainder to various other parties, who are appellees herein, and that one-half of the entire estate was the property of appellant by reason of a marriage having existed between her and Jacob Schwingle from July 1, 1885, until his death on December 11, 1908. Appellees denied that appellant was ever married to the decedent. Judgment was rendered against appellant and an appeal taken to the district court where the cause was tried by jury, which resulted in a verdict and judgment for appellees. We conclude that the jury was justified by the evidence in finding that appellant was not the lawful wife of Jacob Schwingle and consequently not entitled to any of the property in controversy.

Appellant sought to establish what is designated a common-law marriage between her and Jacob Schwingle; that is a marriage not performed by authority of a license granted by the county clerk, by some one authorized by law to perform it, but one that arises by mutual agreement of the contracting parties, and evidenced by cohabitation and other circumstances. Mere cohabitation is not sufficient, for it may evidence the basest and most disreputable relation between the sexes, as well as the purest and most sacred. The law makes marriage a civil contract, although the most important of all contracts in civilized society, and, as every other contract, is based on an agreement in which the minds of the contracting parties meet on the subject-matter of the contract. Cohabitation, after such an agreement, evidences marriage; without such an agreement, it evidences a criminal and immoral relation. Where there is no direct and positive proof of the contract of marriage, it may be inferred or implied from the consistent conduct of the man and woman, and by an uncontroverted reputation in the community in which they live. But whether proved by direct and positive testimony or by circumstances, the essential feature of every marriage is the agreement to live together as man and wife, and it must be proved. When that essential fact is proved, the relation created thereby will be presumed to continue, unless it be shown that it was in some legal manner terminated. But, on the other hand, where the relationship is "conceived in sin and brought forth in iniquity," it will be presumed to continue until a new relationship is proved to have arisen.

The sole object and aim in every case in which the issue is a marriage, or not, is to prove the contract or agreement and when by the nature of things no direct evidence can be obtained, spontaneous declarations, reputation, and other circumstances may, from the very necessity of the case, be resorted to.

In this case it has been attempted to prove the contract of marriage between appellant and Jacob Schwingle by the statements of appellant as to a positive agreement, as well as by cohabitation and by his declarations, and reputation in the community in which they lived, and if her testimony fails to sustain such agreement, cohabitation, nor declaration, nor reputation separate, nor combined, will prove marriage. Without an attempt and a failure to prove an agreement to become husband and wife, the other facts might become potent in establishing the marriage, but when the direct testimony as to the agreement fails the other evidence must fail also, for all the indirect or hearsay evidence is builded upon the agreement to become man and wife.

The only direct evidence tending to establish a marriage contract is that of appellant, who testified that the first time she ever saw Jacob Schwingle was when he came into her house and proposed that she should come and live with him as his wife. She did not know who he was, but he told her, and proposed to take her to live with him as his wife. He did not propose to take her before a judge, or any one else, and marry her, but simply told her it was not necessary for them to get married by the law in El Paso. She said she was ignorant of that matter, and yet she was a woman of at least 30 years of age, and had gone through at least one of the same kind of matrimonial experiences before. She said that Schwingle asked her to live with him as his wife, but it is clear from her testimony that she understood that to mean something different from the legal relation of man and wife, for she testified that in 1897 she "stopped being his wife" and "was not his wife from then on." She said she believed that as they had lived together voluntarily that they could dissolve their relation at pleasure, and that she thought that if she had been married with a ceremony that she could not leave him without a divorce. She never inquired as to the necessity of a marriage ceremony although in Mexico, whence she came, a ceremony was required to consummate a marriage. There never was any marriage ceremony between her and Schwingle, but she went to live with him the second time she ever saw him, and there was testimony that showed that he paid her a salary, although she testified that she did not receive a salary until after she left him when she "saw that German girl planting that unhallowed kiss on his alabaster brow," and she "stopped being his wife." She testified that she never cohabited with him after she had put him away and ceased to be his wife.

Through all her testimony it is clearly shown that appellant's conception of the relationship of a wife was one created by cohabitation, and which was destroyed when cohabitation ceased. In other words, the wife and the concubine are synonymous terms with her, and the relationship of the latter created that of the former. For 10 years she lived with Schwingle and then became disgusted and quit, and from that time until his death, 11 years afterwards, she did not cohabit with him, and set up no claim to any of his property until after his death. She swore that she never thought Schwingle was her husband after she left him in 1897. During 2½ years of the last 11 years of his life Schwingle was in Sinaloa, Mexico, and appellant was in El Paso, Tex. Appellant always called herself Veneranda Moreno until the trial of this case, and always signed her name that way. She borrowed money from Schwingle after she separated from him and repaid him. Appellant admitted living in a state of concubinage with another man in Mexico before she assumed the same relation with Schwingle, and she stated that she had "no other marriages like that except with Mr. Schwingle."

We are of the opinion that the testimony of appellant shows that she never at any time conceived the idea that she had ever been the wife of Schwingle until after his death, as she states that she was made to understand just before or after this suit was instituted that she "was just the same as his wife," because she lived with him so many years, and he used to support her. Giving full credence to her testimony, the jury would not have been justified in finding any other verdict than they did. In addition to her testimony, however, it was shown that she lent money to Schwingle, and took notes and mortgages in his name to her as Veneranda Moreno, and that she signed at least one letter or billet-doux "Your most affectionate servant, Veneranda Moreno." In fact she was known as Veneranda Moreno and always signed her name in that way.

As we have concluded that there was no evidence of an agreement, express or implied, between appellant and Jacob Schwingle that they would become husband and wife, we might dismiss any discussion of the admissibility of statements made by Schwingle and of testimony in regard to reputation, but, out of deference to the brief of counsel, we have given their assignments full consideration.

Reputation is recognized as evidencing marriage, in cases of necessity, and unlike matters of pedigree, may be proved by persons who are not members of the family, because the general public is vitally interested in the status of the man and woman living together as man and wife, or in some disreputable relation, so as to govern their

conduct socially towards them, and protect decent, respectable society from contact with vile associates. Every one acquainted with the parties and the repute they have in the community is qualified to testify as to the reputation of marriage or not. In order, however, to establish marriage by reputation there must be a consensus of opinion that the man and woman living together are husband and wife. If the community is divided as to the status of the parties—that is, if all the witnesses testify that some people thought the parties were not married, while others thought they were—a marriage could not be sustained. But if some witnesses testified that the whole community thought the parties were married, and others swore that the whole community thought they were not married, a question of the credibility of the witnesses would arise, which should be solved by a jury. Any person who knows that the parties were residing together, and who knows what the consensus of opinion was as to their relations with each other, is competent to testify to the matter of reputation. Of course no one should be permitted to testify that a man had the reputation of being a bachelor, when ignorant of the relations upon which others base their testimony as to reputation of marriage. It would not matter that the persons about whom the witnesses testify are in a lower or higher grade of society, nor whether the witnesses are brought into social contact with them or not, if they know that the parties are living together and the reputation as to their status. The reputation as to marriage vel non must arise where both parties reside, and among those who are cognizant of the cohabitation. Within the compass of these rules any witness is competent to testify.

There was no evidence that Jacob Schwingle led a double life, a portion of the community not knowing that he was living in the same house with appellant, and, being ignorant of that fact, thought he was a bachelor. Each one of the witnesses knew of his relations with appellant, and was in a position to testify as to what reputation arose from those relations in the community. The main objections to the testimony seem to be as to the form of the questions and to proof of reputation among any but Mexicans. Neither of them can be sustained. Jacob Schwingle was not living apparently as a single man, as was the condition of the man in the case of Badger v. Badger, 88 N. Y. 547, 42 Am. Rep. 263, relied upon by appellant, but all of the witnesses knew about the woman in this case, and could testify as to the reputation created by her presence in the house of Schwingle although they were Americans and did not associate socially with people occupying such relations to each other. It was proper to allow them to state that Jacob Schwingle had the reputation of being a single man among Americans, as some of the witnesses did. If the Mexicans had formed one conclusion as to the character of connection between the man and woman, and the Americans another, both sides knowing the fact of cohabitation, the evidence would create an affirmative and negative of marriage, which would go to a jury for determination. The Mexicans may have had a better opportunity for determining the status of the parties, but that would be a question of fact for a jury. Jackson v. Jackson, 80 Md. 176, 30 Atl. 752; Hemingway v. Miller, 87 Minn. 123, 91 N. W. 428.

Mrs. Hetblack testified that she was in the house of Jacob Schwingle for three weeks, the year before he died, and that he and appellant were occupying different rooms, and that he treated appellant as a servant, and introduced her as his housekeeper, that she never heard of appellant being his wife, and that her relations with him were such that she probably would have heard of it if he had been living with appellant as his wife, and that she did not hear of it until after his death. The conclusion of the witness as to the probability of her hearing of the marriage had there been one should have been excluded, but in view of the other testimony it was immaterial and could have had no influence on the verdict of the jury.

The eighteenth assignment of error complains of a charge that cohabitation and declarations of the parties that they are husband and wife do not constitute a marriage in the absence of an agreement express or implied. That charge gave the law so far as it went. It was not a comment on the evidence, but the statement of a proposition of law. The criticised charge should be read in connection with other portions of the instructions, and the criticism will be seen to be untenable.

The court did not err in giving the charge whose refusal is assailed in the nineteenth assignment of error. A charge to the same effect was given by the court.

The court did not err in instructing the jury that "an agreement either express or implied, coupled with a proviso or qualification, made at the time of entering into a marriage contract, that either or both of the parties to the contract could dissolve the contract at will, would not in law constitute a marriage contract." The charge is objected to only on the ground that the evidence did not support it. There was testimony by appellant to the effect that the understanding between her and Schwingle was that they would separate when either desired, and both of them acted on those terms afterwards. The authorities cited by appellant merely assert that, where there is an unconditional agreement to become man and wife, the contract cannot be repudiated at pleasure, but in this case there was no agreement to become man and wife because a part of the agreement was to separate at pleasure. Of course no mental reservation

or secret intention of one of the contracting parties to abandon the other at pleasure could vitiate the contract. The subsequent actions of the parties in this case evinced a clear understanding of the agreement to dissolve the relation at pleasure.

The declarations made by Jacob Schwingle to a number of witnesses that appellant was not his wife were spontaneous, and the circumstances under which they were made do not indicate that they were self-serving statements. One was a declaration to a servant while he was working about the place; another was a declaration, under oath, in a justice's court, in the presence of appellant, who during the same trial testified that she was not the wife of Schwingle but was his housekeeper, to which two witnesses testified. The testimony of one of the witnesses as to those declarations was not objected to by appellant. Other declarations to the same effect were made in the course of visits to his house or during casual conversations. They were in each instance spontaneous, and not shown to be made for self-serving purposes. If the evidence had been objectionable, appellant lost the advantage of her objections to it by permitting, without challenge, the witnesses Miller, H. B. Stevens, Charles B. Stevens, and U. S. Goen and others to testify to statements both by Schwingle and appellant to the same effect. Most of the declarations were made during the period of cohabitation, which appellant testified lasted from 1887 to 1897.

There is some conflict of opinion as to whether the declarations of either party to the alleged contract, to the effect that the declarant was not married to the other party should be received, but we are of the opinion that those decisions permitting such declarations are supported by reason and common sense. In the case of In re Imboden's Estate, 111 Mo. App. 220, 86 S. W. 263, a number of authorities are reviewed which sustain the admissibility of such declarations, and the St. Louis Court of Appeals arrives at the same conclusion. That case was cited with approbation by the Supreme Court of Missouri in the case of Toppe v. Perry, 197 Mo. 531, 95 S. W. 204, 114 Am. St. Rep. 777.

In the case of Fryer v. Fryer, Rich. Eq. Cas. (S. C.) 107, the question of common-law marriages is fully discussed, and the decision aptly applies to the facts of this case. In that case it was held that declarations of either party to the effect that there had been or had not been a marriage were permissible.

There was no offspring from the cohabitation of the parties, and the case cannot be complicated with the laudable desire to protect the legitimacy of children, nor is it the case of a young and trusting girl, innocently entering into the disreputable relation sustained by the parties, but it is the case of a woman of mature years, who had before lived as the concubine of a man in Mexico, assuming the relation with an unknown man on their second meeting, without terms of endearment or tender protestations of love, but on the blunt proposition to assume the relation of wife without ceremony, and without sanction of religion or law. With the same ease and abandon that the relation was assumed, it was laid aside when it was desired, or as appellant puts it when she became "disgusted" with Schwingle. The evidence indicates that both parties held their relation as one to be put on and off, as a garment, for she put her understanding of the contract into practical operation, without let or hindrance, or even protest, on his part, and although she came back in his last days to nurse him, she came not as a repentant wife, but as a nurse. In all the letters addressed by him to her, while there were terms of endearment there was not a word to indicate that he recognized the relation of man and wife as existing between them. She never assumed the name of Schwingle until this suit was contemplated and not even then upon her initiative, but upon the suggestion of others that she was a lawful widow and entitled to a community interest in his estate. At no time until after his death did she make any claim to any part of the property, but borrowed money from him and made loans to him, giving and taking the evidences of the debts in the name of Veneranda Moreno, and at one time at least went into court and swore that she was not the wife of Schwingle, this being done in the period of time designated by her as that in which she was living with him as his wife. The evidence leads to the inevitable conclusion that a post mortem endeavor is being made to transform concubinage into marriage for the purpose of appropriating a part of the estate of Jacob Schwingle. Bargna v. Bargna, 127 S. W. 1156. The judge and jury in the trial court came to the same conclusion from overwhelming evidence, and the verdict and judgment should not be disturbed.

The judgment is affirmed.