Coyzet SHELTON, Appellant,

v.

D. R. BELKNAP et al., Appellees.

No. 12761.

Court of Civil Appeals of Texas.
San Antonio.

Jan. 12, 1955.

Rehearing Denied Feb. 9, 1955.

Eastham & Williams and Willard C. Williams, Houston, Frank Rosson, San Antonio, for appellant.

Morriss, Morriss, Boatwright & Lewis, Carl Wright Johnson, and Edward P. Fahey, San Antonio, for appellees.

NORVELL, Justice.

In our original opinion we set forth the conversation of October 1, 1947, between Coyzet Shelton and M. A. Shelton in dialogue form. Complaint is made of this version of the testimony and we therefore substitute the direct questions and answers relative thereto, as they appear in the statement of facts, omitting only the objections of counsel and testimony ruled out by

the trial court. Coyzet Shelton gave two accounts of this conversation and we adopt the one which she says is most favorable to her. The original opinion is accordingly withdrawn and the following adopted by the Court in lieu thereof:

The trial judge held as a matter of law that the evidence was insufficient to show that appellant had contracted a valid common-law marriage with M. A. Shelton, deceased, and accordingly rendered judgment non obstante veredicto in favor of appellees, D. R. Belknap and Adelbert Carpenter. Rule 301, Texas Rules of Civil Procedure. The correctness of this holding is the only question of substance presented by this appeal.

M. A. and Coyzet Shelton had been living together for some time prior to October 30, 1950, when M. A. Shelton was killed in a collision between an automobile in which he was riding and a truck owned by Belknap and driven by Carpenter. Coyzet Shelton brought this action as the surviving wife of M. A. Shelton under the wrongful death statute. Article 4671 et seq., Vernon's Ann.Tex.Stats. She also sued for the benefit of Bertha Sauls and Matthew and James Shelton, the mother of M. A. Shelton and his two sons by a divorced wife. The appellees by a sworn plea challenged the right of Coyzet Shelton to maintain the suit, contending that she was never legally married to M. A. Shelton. This issue was severed from the others in the case, Rule 174(b), and tried to a jury which found, that (1) "On or about October 1, 1947, M. A. Shelton and Coyzet Shelton mutually, unequivocally, and impliedly agreed and consented, the one with the other, to become, then and from that time thenceforth, husband and wife"; (2) that upon the faith of such agreement they had lived together and cohabited, professedly as husband and wife, and (3) that they had held each other out to the public as man and wife.

The appellees in this Court take the position that although there may have been some evidence that M. A. and Coyzet Shelton lived together and held themselves out as husband and wife, nevertheless, under the rule announced by this Court in Schwingle v. Keifer, Tex.Civ.App., 135 S.W. 194, affirmed by the Supreme Court, 105 Tex. 609, 153 S.W. 1132, the controlling and pertinent evidence shows that no legal marriage agreement was entered into by the parties.

■ It is vigorously urged by appellant that this is not a case of "no evidence," and that consequently the trial court erred in rendering judgment non obstante veredicto. The term "no evidence" does not mean literally no evidence at all. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059. It now has a recognized technical meaning, King v. King, 150 Tex. 662, 244 S.W.2d 660, and comprehends those situations wherein by reason of the application of established principles of law, the evidence is deemed legally insufficient to establish an asserted proposition of fact. It is well recognized that while evidence of a certain classification may be pertinent to a disputed issue, it must yield to a higher type or species of evidence when the latter is brought forward and introduced. Numerous examples of the operation of such rules may be given. The parole evidence rule, while a rule of substantive law, is nevertheless illustrative. Likewise, it is well established that recitations contained in the judgment proper control over the balance of the judgment roll when the issue of the validity of a judgment is raised by a collateral attack. 25 Tex.Jur. 853, Judgments, § 328. Similarly, as in the present case, when there is direct evidence of the agreement under which a man and woman live together, indirect evidence of reputation and holding out as husband and wife will not establish a marriage if the direct evidence of the agreement proves the contrary. This is true even though, in the absence of such direct evidence, the indirect evidence of the nature described would have been pertinent to the issue of the existence of a valid marriage agreement. In Schwingle v. Keifer, 135 S.W. 194, 196, Judge Fly, speaking for this Court, stated the applicable rule as follows:

"In this case it has been attempted to prove the contract of marriage be-

tween appellant and Jacob Schwingle by the statements of appellant as to a positive agreement, as well as by cohabitation and by his declarations, and reputation in the community in which they lived, and if her testimony fails to sustain such agreement, cohabitation, nor declaration, nor reputation separate, nor combined, will prove marriage. Without an attempt and a failure to prove an agreement to become husband and wife, the other facts might become potent in establishing the marriage, *but when the direct testimony as to the agreement fails the other evidence must fail also, for all the indirect or hearsay evidence is builded upon the agreement to become man and wife.*" (Italics ours.)

Coyzet Shelton testified that she met M. A. Shelton in 1946, while she was separated from but still the wife of Jack Holmes. She obtained a divorce from Holmes on August 18, 1947. As to her relationship with M. A. Shelton subsequent to this divorce, she testified on direct examination as follows:

"Q. Now then, your divorce was granted on August 18, 1947, and when did you and M. A. first sleep together, Coyzet, with reference to the time and the date of this divorce? A. Around the 25th of August.

"Q. Do you have anything definite that pins down the date of August 25th, or is that just your recollection, your best recollection? A. That is my best recollection, because it was about a week after my divorce.

"Q. It was about a week after, and it was on or around about the 25th of August? A. That is right.

"Q. Where did you and M. A. first sleep together? A. 2142 Looscan Lane in River Oaks. * * *

"Q. When did you begin staying or sleeping with M. A. at 3021 McIlhenny Street, approximately? A. Around the first of October.

"Q. In October? A. Yes, sir, 1947.

"Q. Now, between August 25th, and the time you began living out on McIlhenny Street, did M. A. stay with you, sleep with you at the servants quarters at the Williams? A. He did. * * *

"Q. Now then, Coyzet, directing your attention to a time around the first part of October, did you and M. A. at that time have any conversation with regard to marriage, and if so, what was the conversation, the best you recollect? A. Well, around the first of October, 1947, I was out at McIlhenny Street, about 10:00 o'clock in the morning on the week end, and we had a conversation about marriage, and I asked M. A. when were we going to get married.

"Q. You asked M. A. when were you going to get married? A. Yes.

"Q. All right. A. And he said, 'Ain't I your husband?' I said, 'I don't know.' And he said, 'Well, any man that lives with a woman six months, and she has her divorce and he has his, are common law man and wife.' and I said, 'I didn't know,' and he said, 'I don't know what the law is in Louisiana, but that is the law in Texas.' * * *

"Q. Do you recall anything else that was said at the time that particular conversation was had between you and M. A.? A. Yes, he said, 'From now on what I have is yours and what you have is mine.'

"Q. Do you recall anything that he said? Have you given us, to the best of your recollection, what was said at that time? A. No, not all that was said. He objected.

"Q. From the time you got your divorce, Coyzet, to the time that you had this conversation with M. A., that you have just related, were you expecting a ceremonial marriage with M. A.? A. I were.

"Q. Had M. A. ever actually said anything about a ceremonial marriage, not marriage, but a ceremonial marriage? A. No, he hadn't, not a ceremonial marriage. * * *

"Q. Coyzet, let me ask you this question then. You have told us you and M. A. began sleeping together around the 25th of August, out at the Williams? A. That is right.

"Q. And you didn't have this conversation with M. A. until around the first of October? A. That is right.

"Q. Now, please tell us, Coyzet, why did you sleep with M. A. why did you let him sleep with you from August 25th until around the first of October? A. Because we had got engaged to get married."

The testimony of appellant shows that she commenced living with M. A. Shelton in reliance upon some promise of a marriage to take place in the future. It is undisputed that the union was meretricious in origin. In Cuneo v. De Cuneo, 1900, 24 Tex.Civ.App. 436, 59 S.W. 284, 285, Mr. Justice Neill, speaking for this Court, said:

"It is not sufficient to agree upon a present cohabitation and a future marriage. 1 Bish.Mar. & Div. § 262; Cartwright v. McGown, 121 Ill. 388, 12 N.E. 737. It is required that the cohabitation be as man and wife, and in pursuance of the marriage contract. * * * 'A mere illicit intercourse, though extending over a long period, can never have the effect of validating or consummating a marriage dependent upon cohabitation to complete it.' Rodg.Dom.Rel. § 96, and authorities cited. Living and cohabiting as husband and wife, or declarations of the parties that they are husband and wife, do not of themselves constitute a marriage in fact. Such acts and declarations are not a substitute for the marriage contract, but are only evidence that may be sufficient to prove a lawful marriage. And when the evidence shows that at the time of the commencement of the cohabitation and conduct from which it is sought to prove a marriage in fact there was in fact no marriage, their mere continuance of such cohabitation and conduct, without something more to indicate that there had been a change in the relation of the parties to each other, would not be sufficient to show a marriage in fact subsequent to the commencement of such cohabitation and conduct. But the presumption against marriage, when the connection between the parties is shown to have been illicit in origin, may be overcome by proof showing that the original connection has changed its character; and a subsequent marriage may be proved by circumstances. The circumstances, however, must be such as to exclude the inference or presumptions that the former relation continued, and show that it had been changed into that of actual matrimony by mutual consent."

In this case, there is direct evidence as to the events of October 1, 1947, when, according to appellant's theory, an illicit relationship was superseded by matrimony. The testimony of Coyzet Shelton related to the res gestae of the alleged marriage. The statements to which she testified are described by Wigmore as verbal acts— "utterances forming a part of the issue," and it is pointed out that the making of a contract "necessarily involves utterances by conversation (as in this case), letter, telegram and the like * * *." By way of example, it is said that, "The consent which in Scotland and in the United States generally suffices to constitute the (common law) marriage contract is thus to be learned from the utterances of the cohabiting persons." Wigmore on Evidence, 3d Ed., § 1770. It seems that the "common law marriage" is unknown to the law of England. In re Roberts' Estate (Roberts v. Roberts), 58 Wyo. 438, 133 P.2d 492.

Appellant argues that she should not be bound by her account of the statements made by M. A. Shelton, as he was not testifying in the course of a judicial proceeding. United States Fidelity & Guaran-

ty Co. v. Carr, Tex.Civ.App., 242 S.W.2d 224, wr. ref. The fact remains, however, that her testimony constitutes the only direct evidence of the terms of the arrangement or understanding relied upon to establish the marriage theory. Perales v. Flores, Tex.Civ.App., 147 S.W.2d 974, wr. ref.; Clack v. Williams, Tex.Civ.App., 189 S.W.2d 503. From the account given of the October conversation it appears that M. A. Shelton believed that under the law of the State of Texas a man and woman, being free of legal impediments, would become man and wife by living together six months. It is likewise clear that the agreement was entered into with this mistaken belief or misapprehension in mind. Six months had not expired since Coyzet had received her divorce from Jack Holmes, so that the parties must have intended to live together for a six-months period, at the end of which time they believed they would become husband and wife by operation of the Texas law. In any event, it seems certain that the parties did not, by the words employed by them, evince an intention to presently become husband and wife, nor can such intention be implied contrary to the express words used by them.

We are not unmindful of the fact that numerous persons entertain serious misunderstanding as to the essentials of a common-law marriage. There seems to be a false and spurious "common law," so to speak, under which it is occasionally urged that a union of a type never regarded as valid by the common law should be afforded recognition as fixing property rights. The words "common law marriage" are often used by non-technical writers and speakers, to describe a union between a man and a woman of uncertain origin and nature, which the writer or speaker is either unable or does not desire to classify with certainty. The term is often used as a convenient appellation for a status which is neither "marriage" nor "common law," insofar as recognition of its validity is concerned. It may be that Coyzet Shelton is the unfortunate victim of this spurious common law and in all good faith may have supposed that at the end of a six-months period, if all went well, she and M. A. would stand as husband and wife before the law. The Supreme Court of Texas, however, recognizes but one form of agreement as fulfilling the basic requirements for a legal marriage status. "The method by which it (the marriage agreement) is solemnized or entered into may be by proceedings prescribed by statute, or by mutual agreement with cohabitation, but, however contracted, having the same elements, and producing the status of husband and wife. The sole difference which can legally exist is in the method of expressing consent; and the only particular in which a marriage as at common law can differ from the statutory method is the absence of license and ceremony." Grigsby v. Reib, 105 Tex. 597, 153 S.W. 1124, 1130, L.R.A.1915E, 1. The agreement must be one to become then and from that time thenceforth husband and wife. A consent de praesenti is essential. Cuneo v. De Cuneo, 24 Tex.Civ.App. 436, 59 S.W. 284.

In holding as a matter of law that the direct and controlling evidence adduced upon the trial was insufficient to establish a marriage, the trial judge applied the applicable rules heretofore laid down by this Court and the Supreme Court. We adhere to our original order affirming the judgment of the trial court.

Appellant's motion for rehearing is overruled.