Sigrid Josephine WALTER, Indv. etc., et al., Appellants,

v.

Frank Paul WALTER et al., Appellees.

No. 15289.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Argued Sept. 5, 1968.

Rehearing Denied Nov. 7, 1968.

Franklin, Kelly, Graham & Laughter, W. K. Graham, Houston, for appellants.

Fountain, Cox & Gaines, Houston, Morriss, Boatwright, Lewis & Davis, Will A. Morriss, Jr., San Antonio, for appellees.

COLEMAN, Justice.

This is a suit instituted by Wanda Lee Twilligear as next friend for Frank Paul Walter and Bonnie Dee Walter, minors, for a declaratory judgment that said minors were the legitimate children, the "heirs of the body", of John Paul Walter and as such entitled to the ⅓rd interest of the estate of Frank J. Walter, deceased, the father of John Paul Walter, under his will, and for accounting and partition. During the course of the trial the action for accounting and partition was severed.

The trial was to a jury and issues were submitted on ceremonial marriage, putative marriage, and common law marriage. The jury answered the issues on ceremonial marriage and putative marriage adversely to the interests of the children, but it answered the issues on common law marriage in their favor. The trial court entered judgment on the jury verdict that Frank Paul Walter and Bonnie Dee Walter are the legitimate children of John Paul Walter and as such are entitled to share in the estate of Frank J. Walter as provided in his will. Appellants, the mother and brothers of John Paul Walter, appeal and, in addition to other asserted errors, contend that the trial court erred in submitting to the jury Special Issues Nos. 2 and 3, reading:

Special Issue No. 2

"Do you find from a preponderance of the evidence that John Walter and Wanda Crenshaw mutually agreed and consented to presently become man and wife?"

Special Issue No. 3

"Do you find from a preponderance of the evidence that in pursuance of such agreement, if any, John Walter and Wanda Crenshaw lived and cohabited together as husband and wife?"

The basis on which this contention is made is that there was not sufficient evidence in the record to support the jury's answers thereto.

For convenience Wanda Lee Twilligear will be referred to in this opinion as "Wanda" and John Paul Walter as "John". Wanda was born on the 31st day of July, 1940. John was born on the 3rd day of May, 1943. Frank Paul Walter and his wife, Sigrid Josephine Walter, owned a house near Leakey, Texas, a town of some five or six hundred population, which they used for recreational purposes. While visiting this house during vacations John and Wanda became acquainted. Frank Paul Walter became seriously ill with a disabling disease and the family moved to the house in Leakey. In addition to John, the Walters had two sons, Frank and Robert. Mr. Walter died in May, 1959. By his will certain property was left in trust for his three sons and his wife was named as a trustee. The will provided that if any son died before delivery to him of his full share of the estate, the unpaid portion "shall pass to and vest in the heirs of his body", if he left such surviving; otherwise it would go to his surviving brothers. John was killed in an automobile accident in 1962.

In view of the nature of the case the testimony of the witnesses placed on the witness stand by the appellees pertinent to the issues on common law marriage will be reviewed in some detail.

The only witness who was in a position to know in detail the agreements and transactions between the parties to the alleged common law marriage was Wanda. The pertinent testimony will be summarized. She and John began dating in 1957. Prior to the trip to Mexico during which the alleged ceremonial marriage occurred, they had discussed marriage. They were both in high school; he was a freshman or sophomore. They drove to Mexico alone. While they were having dinner, John suggested that they be married immediately. She readily agreed. As they left the cafe a guide approached them and, at their request, agreed to take them to a place where they could be married. They secured no marriage license, but the man with whom the guide made the arrangements conducted a ceremony in the Spanish language. The guide told them when to say "I do". They signed their names on a paper and a certificate of marriage was given to John, who, some months later, gave it to Wanda. She delivered this certificate to her lawyer and it, together with an English translation, was the same certificate delivered to them at the time of the marriage. This marriage was celebrated on June 17, 1958. (Appellants introduced evidence that the official whose name appeared on the certificate did not assume the indicated office until 1963, and that after a search of the appropriate marriage records of the Mexican state in which it was alleged to have taken place, no record of the marriage was found.)

After the ceremony Wanda and John went to a motel in Uvalde where they stayed for three or four hours and then returned to Leakey late in the morning. They told no one about the marriage at this time. She continued to live in the home of her parents, and John continued to live in the home of his parents. They were together a great deal of the time when John was not in school. She worked at her parents' cafe. From time to time they slept with each other in Wanda's room at her family home. On these occasions John would set the alarm for three or four

o'clock and then get up and go home—"to his mother's home". John played football and she went with his mother to several of the games, but she did not tell her that she and John were married. On one occasion John's mother questioned them about a report about someone "laying around down on the river", and they denied that they were involved. She double-dated with Bobby and Doris Chism after June 17, 1958, and prior to the birth of the first baby, but she could not recall telling them that she was married. She testified that at some time prior to the birth of the first child she told possibly a dozen people that she was married to John. Jack Crenshaw, Wanda's father, testified that possibly three or four months before the baby was born Wanda told him she and John were married in Old Mexico, and that "it has been a secret." Lona Crenshaw, Wanda's mother, testified that "about two months before the baby was born" Wanda told her that she had married John in Mexico.

Wanda testified that she and John began "staying" in her parents' home after she told her father and mother of the marriage, but that they had sexual relations together at her parents' home before that time. Specifically she testified:

Q Mrs. Twilligear, to this day have you ever lived in the same house with John Walter as man and wife?

A Yes, sir.

Q When was that?

A In our home, at my mother and father's.

Q You mean you were having sexual relations in the home, is that what you call living together as man and wife?

A Wouldn't it be? We would go to bed together and get up the next morning.

Q Would he stay there all night?

A Yes, after he left, when his mother took him to Austin, when he would

would come back on weekends. If that is not staying together, I don't know what is.

Q The child * * * Before the child was born, from June 17, 1958, until this baby was born * * *

A Oh, we stayed together.

Q Did you ever spend the whole night together?

A No. We would go to bed and set the alarm for 3:00 or 4:00 in the morning and he would get up and go home, to his mother's home.

> *   *   *   *   *   *

Q What do the words people living together as man and wife, what does that mean to you?

A As man and wife, you don't have to be living together to be man and wife, your husband can be off from you and you still be man and wife living together. Are you married?

Q I am asking you.

A That is the way I feel about it.

Wanda did not consult a doctor until she was 4½ months pregnant although she told John that she suspected pregnancy. Thereafter she continued work up to the day the child was born without further medical consultation. When it became apparent that the birth was imminent, her mother secured the services of a practicing naturopathic physician, the only medical man residing in Leakey. John was at the house when the child was born and he told Dr. Meyers that he was the father of the child and that he had married Wanda in Mexico. Acting on this information the doctor prepared a birth certificate showing John as the father, Wanda as the mother, and that the birth was legitimate. The birth certificate was filed for record and a copy is in evidence. John paid the doctor's fee. Later that night he went to his mother's home and announced to her that she was a grandmother. The next day his mother

moved her residence to Austin, Texas, taking John with her.

John did not get to come back to Leakey for several weeks. About a month after the baby was born he took Wanda to see his mother and harsh words were spoken. He usually came to Leakey to see Wanda once or, sometimes, twice a month while he lived in Austin. When his mother moved to Houston, the trips were not quite so frequent. When he came to Leakey "the biggest part of the time he stayed at our home." He introduced her to some five people, she remembered, as his wife. He wrote letter to her addressed to Wanda Walter, or Mrs. Wanda Walter. The letters, but not the envelopes, are in evidence. Most of the letters are undated, and only one contains a possible reference to the second child. None of the letters mention or make any reference to marriage. In all of the letters, however, there are expressions of love for Wanda and the baby. He purchased toys, articles of clothing, a baby bed and stroller for the child, and sent some money to Wanda. Wanda visited him "more than two or three times" in Austin. One time they rented a motel room, but John went home before day. On one occasion she went to the apartment where John lived while his mother was absent. While they were driving in Austin, some of John's friends drove up beside them and asked if Wanda was his wife and said that they were fortunate to have such a nice apartment. When John came to Leakey, he brought a suitcase "a time or two". He took her and the child, or children, driving, to the cafe, to Uvalde, to the picture show, and to different friends' houses. John told her that he wished to live with her all of the time, but that if he ever lived with her his mother "would disinherit him, cut him off of everything he was entitled to." She saw him "maybe four or five times" after the second child was born on May 31, 1961. She did not attend John's funeral because of her distraught condition, but she arranged for flowers to be sent. After John's death she did not contact either John's mother, or his brothers, and tell them that she was married to John.

The following testimony is deemed significant and is quoted verbatim:

Q Now, Mrs. Twilligear, you have introduced in evidence a certificate. You have introduced this certificate and you have testified that you were married in Mexico and this instrument was handed to you. Do you claim any other ceremonial marriage with John Walter?

A No, sir, none other than that.

   \*     \*     \*     \*     \*     \*

Q Did you ever go before any other official for the purpose of getting married?

A No. We assumed this right here was all we needed, that was legal.

Q This is the only marriage to John Walter that you claim?

A Yes.

   \*     \*     \*     \*     \*     \*

Q From June 17, 1958, on did you and John stay together as husband and wife and have relations as husband and wife?

A Yes, sir.

She also testified that the June 17, 1958, marriage was the "only ceremonial marriage we ever had. We thought that was legal." At her last appearance on the witness stand she testified:

Q Did you ever at any time tell anybody that you were not married to John Walter after June 17, 1958?

A No. I never told a soul.

Q Did John ever in your hearing or presence at any time tell anybody that you and he were not married?

A No, I never heard him say that.

Q Is John Walter the father of your children?

A Yes, sir, he sure is.

Q  Did you at all times from June 17, 1958, until the time of his death in good faith believe that you were the wife of John Walter?

A  Yes, I sure did. I believed I was his wife.

Q  Did you in good faith believe you and he were married to each other as husband and wife?

A  Yes, I thought we were very much married.

The testimony of the other witnesses for the appellees was largely corroborative of that of Wanda. Jack Crenshaw, in addition to the testimony already attributed to him, stated that John was not living at his house at any time before the baby was born. That night John told him that they had been married in Old Mexico. The marriage was recorded in the family bible as having taken place in Mexico across from Del Rio 6–17–58. For a while after the child was born, John didn't get to come back "too often". Later he came every week or two or three weeks. He spent the night "at my place quite a few times". He supposed he slept there. Wanda ironed a shirt and a pair of pants for John one time. He didn't always "stay at my house" when he came to Leakey. They took the baby with them to the picture show and ball games. Three days after the baby was born John told his mother in the presence of Jack and his wife: "We are married." John told him that when he was twenty-one, he and Wanda were going to live together permanently. They never had an apartment or home of their own. After the baby was born Wanda went by the name of "Wanda Walter". Jack said, "If they stayed together they were living together, like they stay together at night, they are living together."

Mrs. Lona Crenshaw testified that after June, 1958, John and Wanda were always together at the cafe and the house when he was not at school. Wanda went by the name Crenshaw before the baby was born. John was a school boy living at home with his mother. After he moved to Austin, John came back "when he had a chance", usually every two or three weeks. He stayed at our house "some". He did stay "completely all night", but she didn't remember when that happened. This was when he came by himself. When he came with someone else he often slept at Bob Chism's picture show or maybe at Cal Fisher's. John and Wanda "never set up housekeeping". John took Wanda and the babies places and wrote letters addressed to Mrs. Wanda Walter.

Hal Lestikow testified that he learned John and Wanda were married "a good while" before the baby was born—he estimated ten months or a year. Before the child was born John and Wanda came to his house. Huey Buchanan, his wife, and Vernon Stanley were there. "John just said, 'This is my wife now.' " It was the general reputation around Leakey that they were married. He saw them fairly frequently with the children usually at his own house. Later he testified that they didn't have a house of their own. John lived with his mother in Leakey and Wanda with her mother and daddy. John and Wanda were together like any other school children in Leakey. He saw John very few times after the baby was born. John told Jean Boring that Wanda was his wife.

Sally Godbold testified that she heard Jack Crenshaw tell Mrs. Walter: "The kids are married and I think we ought to let them live together and not spoil their lives." She testified that it was the general belief in Leakey from 1959 to John's death that John and Wanda were married. "People believed what they said that they were married." She had never heard John or Wanda say they were married and never saw John in the Crenshaw home. She did see John's car there. She never knew of them living together, but John was there a great deal. "John was supposed to be living with his mother going to school." She never heard Wanda called Wanda Walter. When people spoke of her, her last name was not used.

Mary Lou Clanton testified that in September, 1958, John told Bobby and Frank in her presence that he and Wanda were married. She also heard him introduce Wanda to a waitress in Kerrville as his wife. He told Bostick, the bread man, that he and Wanda were married, but she didn't remember whether that happened before the baby was born. John lived at home with his mother, prior to the birth of the baby, and Wanda lived with her parents. Afterwards John lived in Austin, and never lived in Leakey for any length of time. However she saw him many times. She worked at the Crenshaw Cafe. John came back approximately once or twice a month and on these occasions lived at the Crenshaw house. She didn't know whether he spent the night, but she saw him there late at night and early in the morning.

Mrs. Meyers testified that the night the baby was born John told them that he and Wanda were married in Mexico. Both she and her husband testified that they saw them riding in a car with the child a few times afterwards.

Effie Lestikow testified that John told her in the spring or early summer of 1959 that he was married to Wanda. She had never discussed the marriage with Wanda. After John moved to Austin he told her that "he wanted to be with his family and wanted them to be together." The general reputation in Leakey was that they were married. She moved back to Leakey sometime in 1960 and saw John, Wanda, and the baby together. While she didn't know whether John ever lived in the Crenshaw house, she never saw or heard of him doing so. She never heard of them setting up housekeeping in Leakey or living together there. The only fact that caused her to believe they were married was that John told her so.

W. B. Sansom, the County Judge of Real County, testified that the general reputation was that John and Wanda were married.

He saw them together at various times and was told they were married in Mexico. They lived together as man and wife, but he did not know when or where they lived together.

Lucille Crenshaw testified that from the year 1959 the general reputation in Leakey was that John and Wanda were married. The family history was that they were married in Mexico. She "supposed" they lived together, but she did not know when or where.

Roceil Graves, a school teacher, testified as to the general reputation of marriage. Wanda lived with her parents and John lived with his mother. "It was assumed" that they lived together as man and wife, but she did not know when or where they lived together.

Mrs. Iola Carpenter, Clerk of Selective Service Local Board No. 60, testified that John returned his selective service questionnaire June 26, 1961. It showed his residence to be Houston, Texas, and that he had never been married and had no dependents. Mrs. Sigrid Josephine Walter, Robert J. Walter, and Frank J. Walter, Jr., testified that neither John nor Wanda ever told them that they were married. Other witnesses were presented by appellants who contradicted the testimony that the general reputation in Leakey was that John and Wanda were married.

During the course of the trial, and after several witnesses had been examined, counsel for appellees, in the absence of the jury, moved that any interrogatories of the witnesses as to any individual acts of alleged misconduct on the part of Wanda "not be inquired into" by counsel for appellants. The trial court sustained the motion. Counsel for appellants excepted and asked permission to withdraw his announcement of ready and that the case be continued because of surprise at the court's ruling. The court later explained his ruling to the effect that appellants could show that

Wanda did go out with other men during the time she claimed to be married to John, but that they could not show that she "went any further".

While each of several witnesses was on the stand, appellants' attorney requested, and was granted, permission to develop testimony for a bill of exceptions; one of these witnesses testified to specific acts of sexual misconduct on the part of Wanda. Several testified that Wanda's reputation for chastity was bad.

Chastity or unchastity has usually been regarded as provable by reputation. McCormick and Ray, Texas Law of Evidence, 2nd Ed., Vol. II, Sec. 1328; Ingersol et al v. McWillie, 9 Tex.Civ.App. 543, 30 S.W. 56 (1895, writ ref. 87 Tex. 647, 30 S.W. 869); Salvini v. Salvini, 2 S.W.2d 963 (El Paso Civ.App.1928, writ dism.); Rodriguez v. Texas Employers' Ins. Ass'n., 35 S.W.2d 510 (Galv.Civ.App.1931, no writ). The evidence was relevant and material on the issues concerning common law marriage. The trial court had twice advised counsel that he would not admit such testimony. The testimony taken out of the presence of the jury as each witness was placed on the stand merely developed the testimony which appellants would have introduced had the trial court not foreclosed its production in open court. The trial court would properly have considered any effort on the part of appellants' attorney to tender this evidence in open court as contemptuous conduct. Considering the issues before the court and the entire record, the error of the court in suppressing this testimony was calculated to, and probably did, result in an improper verdict.

Appellants' point of error No. 13 is also sustained. Special Issue No. 3 was submitted by the trial court in this language:

"Do you find from a preponderance of the evidence that in pursuance of such agreement, if any, John Walter and Wanda Crenshaw lived and cohabited together as husband and wife?

"Answer 'We do' or 'We do not'.

"In connection with the above issue you are instructed that it is not necessary that the parties live together for any specified time, or that they live together continuously for any specified time."

Appellants objected to the charge for its failure to define the term "living and cohabiting together", and tendered the following definition: "The term lived and cohabited together as husband and wife means living together, claiming to be married and doing those things ordinarily done by husband and wife."

Under the peculiar facts of this case the failure to define the term was error. Rule 279, Texas Rules of Civil Procedure. The definition tendered is substantially correct. It appears in the opinion of the Court of Civil Appeals in Humble Oil & Refining Co. v. Jeffrey, 38 S.W.2d 374 (Austin Civ.App.1931, aff'd Tex.Com. App., 55 S.W.2d 521). This case was cited as authority for a similar definition in Drummond v. Benson, 133 S.W.2d 154 (San Antonio Tex.Civ.App.1939, writ ref.). It is also approved in Robinson v. Casey, 272 S.W. 536 (Amarillo Civ.App.1925, writ dism.).

The appellants' contention that there was no evidence to warrant the submission of Special Issues 2 and 3 presents considerable difficulty. In Ex Parte Threet, 160 Tex. 482, 333 S.W.2d 361 (1960) the Court said:

"What elements, then, need be shown to make a prima facie or tentative showing of a common law marriage?

"In Texas, three elements must exist: (1) an agreement to be husband and wife; (2) living together as husband and wife; and (3) a holding out to the public that the couple are husband and

wife. Grigsby v. Reib, 1913, 105 Tex. 597, 153 S.W. 1124, L.R.A.1915E, 1; Shelton v. Belknap, 1955, 155 Tex. 37, 282 S.W.2d 682.

"In the Grigsby case, supra, this Court announced that the marriage was more than a contract; it is a status. The living together *as man and wife* and the public and open holding out that the two are man and wife are as essential to a valid common law marriage as the agreement itself. Without these elements, there is no common law marriage."

In Perales v. Flores, 147 S.W.2d 974 (San Antonio Tex.Civ.App.1941, writ ref.), the court quoted from the opinion of the Court of Civil Appeals in Schwingle v. Keifer, Tex.Civ.App., 135 S.W. 194, and from the opinion of the Supreme Court of Texas affirming that case, as follows:

"In the case of Schwingle v. Keifer, [Tex.Civ.App.,] 135 S.W. 194, 196, the late Chief Justice Fly, speaking for this Court, said: 'In this case it has been attempted to prove the contract of marriage between appellant and Jacob Schwingle by the statements of appellant as to a positive agreement, as well as by cohabitation and by his declarations, and reputation in the community in which they lived, and if her testimony fails to sustain such agreement, cohabitation, nor declaration, nor reputation, separate, nor combined, will prove marriage. Without an attempt and a failure to prove an agreement to become husband and wife, the other facts might become potent in establishing the marriage, but when the direct testimony as to the agreement fails the other evidence must fail also, for all the indirect or hearsay evidence is builded upon the agreement to become man and wife.'

"In affirming this Court's decision in the Schwingle case, Chief Justice Brown, of the Texas Supreme Court, said:

"'A living and cohabiting together as husband and wife, or declarations of the parties that they are husband and wife, do not of themselves constitute a marriage in fact, in the absence of an agreement, express or implied. An agreement, either express or implied, coupled with a proviso or qualification, made at the time of entering into a marriage contract, that either or both of the parties to the contract could dissolve the contract at will would not in law constitute a marriage contract. * * *'"

Here there was direct testimony of an agreement between John and Wanda to be married entered into on June 17, 1958. The jury failed to find that they entered into a ceremonial marriage on that date. Such an agreement to be married would be sufficient as the basis for a common law marriage if the other necessary elements were present. There is evidence from which the jury might well have concluded that acts of sexual intercourse took place between the parties soon after the agreement. They did not, however, hold themselves out to the public as husband and wife and live together publicly in that relationship for several months. They told no one that they were married for a period of months. There can be no secret common law marriage. James v. James, 253 S.W. 1112 (San Antonio Civ.App.1923, writ den.). A common law marriage cannot be founded on an agreement to be married in the future. The agreement must be one to presently assume the relationship of husband and wife. The relationship that existed between them after June 17, 1958, for several months at least, was illicit.[1]

---

1. The relationship between John and Wanda may well be branded illicit prior to May 3, 1959, on which date he became sixteen years of age. On June 5, 1837 the Congress of the Republic of Texas enacted a law authorizing certain judges, justices of the peace, and ordained ministers to "celebrate the rites of matrimony between all persons legally authorized to marry; provided, that males under fourteen and females under twelve years of age shall not marry." This was a part of a comprehensive law enacted to legalize certain previous marriages conducted by

While there is some testimony that a few months prior to the birth of the child a limited number of people were told by Wanda or John that they were married,

persons not authorized to celebrate marriage, as well as to legalize bond marriages; provided for a procedure for securing marriage licenses, and prohibited the issuance of such licenses to males under the age of 21 and females under the the age of 18. Articles 4663–4670, Laws of Texas, Paschal's Anno. Digest, Vol. 1. These laws were continued in force by the Constitution of the State of Texas. The act was amended in 1866 to raise the age for legal marriage from 12 and 14 to 14 and 16. Except for various amendments making the requirements for securing a license to marry more stringent, the statutory law today is essentially the same as passed by the Congress of the Republic.

We have been cited to no case, and have found none in our research, determining the legal status of children (under the prohibited age for marriage), who have attempted to be married either ceremonially or by common law agreement.

In Robertson v. Cole, 12 Tex. 356 (1854), the marriage of a girl fifteen years of age which was never consummated, was declared voidable and adjudged void. However, the Court, after summarizing the laws on marriage including the statement that males under fourteen and females under twelve are prohibited to marry, stated: "It may, however, possibly be the law—at least, it may be admitted as a point not necessary to be controverted in this case—that these requisitions are but directory, and the consent of parties over age would, of itself, without any peculiar ceremonies of statutory formalities, be sufficient to give validity to marriages. The statute has not, in terms, declared that marriages, for want of such formalities, shall be null and void * * *."

The case of Williams v. White, 263 S.W. 2d 666 (Austin Tex.Civ.App.1953, ref., n. r. e.), held that the marriage of a female under the age of eighteen could not be annulled at the suit of her parents. This statement appears in the opinion:

"We have no statute which declares the marriage of a seventeen-year old boy and a sixteen-year old girl void because of nonage. On the other hand it is the plain implication of Art. 4603, supra, that males over sixteen and females over fourteen may lawfully enter into a contract of marriage. Portwood v. Port-

wood, Tex.Civ.App., 109 S.W.2d 515 at page 522, Eastland, writ dism.

"Art. 4605, V.A.C.S. upon which appellee so heavily relies provides that no County Clerk may issue a license to marry without the consent of the parent or guardian, if any, of the parties unless as to the male applicant that he is twenty-one years of age and as to the female applicant that she is eighteen years of age.

"There is no prohibition in this statute that those under the stated ages shall not marry and, of course, no provision that should they marry that such marriage would be void, voidable or invalid in any respect.

"Appellee expresses concern over the legislative intent in enacting Art. 4605 unless it was to prohibit marriages under the ages stated. As to this we can only say that the only intent to be gathered from the statute itself is that the County Clerk cannot issue licenses to marry without complying and compelling compliance with its terms. We cannot read into this statute a prohibition which is not there nor a repeal of Art. 4603, nor can we consider such statute as a partial abrogation of the doctrine of common-law marriage which prevails in this State and the validity of which is not dependent upon the issuance of any license to marry."

In Kissick v. Garland Independent School District, 330 S.W.2d 708 (Dallas Tex.Civ.App.1959, ref., n. r. e.), the Court said:

"Appellant asserts that such resolution is violative of public policy in that it penalizes persons because of marriage. Consistent with limitations and requirements of State Statutes, both civil and criminal, the point is overruled. Art. 4603, V.A.C.S., provides that 'males under sixteen and females under fourteen years of age shall not marry'. Art. 404, Vernon's Ann.Penal Code, makes it a criminal offense for the County Clerk to issue a marriage license to males under twenty-one or females under eighteen without consent of parents or guardian, or in lieu thereof the County Judge, under penalty of a $1,000 fine. Art. 4605, V.A.C.S., places similar restrictions on issuance of a marriage license to males under twenty-one and females under eighteen. And in the summer of 1959 our Legislature evidenced its concern over the problem of 'teen-age' marriages by amending Art. 4605. Issuance of li-

there is no evidence that prior to that time they publicly held themselves out as husband and wife, or that they lived and cohabited together as husband and wife.

■ There is no sufficient evidence of a change in that relationship after the birth of the first child to require the submission of issues on common law marriage. The testimony of Wanda denies by implication, at least, the formation of a new express agreement. If, as she testified, she thought she was legally married in Mexico and continued in that belief to the day

cense to marry was prohibited to such underage applicants except 'upon the consent and authority *expressly given* by the parents or guardian of such underage applicant *in the presence of the authority issuing such license*', * * * (emphasis ours) ; also requiring that application therefor be on file in the County Clerk's office for not less than three days prior thereto.

"As appellant states, it is indeed the policy of the law to look with favor upon marriage, and to seek in all lawful ways to uphold this most important of social institutions; every intendment being in favor of matrimony. Gress v. Gress, Tex.Civ.App., 209 S.W.2d 1003. The principle however is referable to those of lawful age (male twenty-one, female eighteen). On the other hand, the legislative policy is otherwise insofar as an underage marriage is concerned; it being clearly manifest that by the cited Statutes a public policy is announced unfavorable to and in outright discouragement of 'underage applicants' for matrimony."

In Portwood v. Portwood, 109 S.W. 2d 515 (Eastland Tex.Civ.App., 1937, writ dism.), the Court said that Art. 4603 in prohibiting the marriage of boys under the age of sixteen by implication authorized the marriage of a boy sixteen years of age or older. The court then held that a ceremonial marriage could not be avoided, except as provided by Art. 4628, R.C.S., even though the marriage was performed in Oklahoma and did not meet the requirements of the Oklahoma law.

In Needam v. Needam, 183 Va. 681, 33 S.E.2d 288 (1945), the common law pertinent to this question is stated in these words:

"At common law, marriages of infants under the age of seven years were absolutely null and void; but marriages of infants over seven, but under the age of consent, which was twelve for a female and fourteen for a male, were voidable, at the election of the party under such age, while marriages occurring after they attained the age of consent were absolutely valid. At common law, the consent of a parent or guardian was not essential to the validity of the marriage of a minor over the age of consent for marriage. Bishop on Marriage, Divorce and Separation, §§ 571, 572, and 582; 35 Am.Jur. Marriage, §§ 21 and 103; Annotation, 22 L.R.A.,N.S., page 1206."

While the statutory law of Virginia is quite comparable to that of Texas with the exception of the age limits, the writer is not persuaded that the best interests of either society or the children involved are served by permitting under any circumstances marriages, either ceremonial or common law, of children in violation of Art. 4603. Under the law of this state these children would be emancipated from the control of their parents and deprived of the protection accorded children of the same age by the law. If a marriage between a boy fifteen years of age can be avoided only with his consent on the grounds provided in Art. 4628, the same must be true of a boy or girl eight years of age. It will be a rare boy fifteen years of age, or girl thirteen years of age, or younger, who would have the maturity and judgment to be capable of sustaining the marital relationship. The oldest of the boys forbidden to marry will barely have reached high school, and the girls will not be out of grade school. Virtually none of them will have had the experience and skills that children of such an age had in 1866. In many such cases the marriage will be one in name only, once discovered, and divorce on flimsy grounds or on perjured testimony will result. If it is thought desirable the legislature can enact legislation regarding the status of the children born of such unfortunate unions.

If, as it appears, such marriages have never been recognized in this state, I see no justification for any court to disregard the plain impact of Art. 4603 in this more enlightened age. It appears that the intent of the Congress of the Republic, and the subsequent legislatures which have considered the matter, was to change the common law age of seven to sixteen in the case of boys and fourteen in the case of girls. Marriages under that age should be held void. Child marriages should not be protected by the courts in this State.

she testified, a new agreement to be married following the birth of the child cannot logically be inferred from testimony that they held themselves out to the public as husband and wife and at intervals spent the night together. Since the testimony concerning the general reputation that these young people were married is divided, and seems to have been based on statements that they were married in Mexico, it can be given but little weight. This is particularly true since appellees brought to the witness stand one of the parties to the alleged common law marriage. Had there been a new agreement to marry, she could have detailed it, but on the contrary the purport of her testimony is to the contrary. De Shazo v. Christian, 191 S.W.2d 495 (Amarillo Tex.Civ.App.1945, ref., n. r. e.); Clack v. Williams, 189 S.W.2d 503 (San Antonio Tex.Civ.App.1945, dism., w. m.); United States Fidelity & Guaranty Co. v. Dowdle, 269 S.W. 119 (Dallas Civ. App.1925, no writ hist.).

■■■ Since the relationship between the parties was illicit in its origin, the law raises from it no presumption of marriage. Drummond v. Benson, 133 S.W.2d 154 (San Antonio Tex.Civ.App.1939, writ ref.). In the case above cited the court quoted from Schwingle v. Keifer, Tex.Civ.App., 135 S.W. 194, 195: "'Where there is no direct and positive proof of the contract of marriage, it may be inferred or implied from the *consistent* conduct of the man and woman, and by an *uncontroverted* reputation in the community in which they live." (Italics added).

In Brown v. Brown, 115 S.W.2d 786 (Galv.Tex.Civ.App.1938, no writ), the court said: "The relationship being meretricious in its inception, the evidence that it later became lawful would have to be positive and satisfactory, which it was not. * * *"

■■■ In addition there is not sufficient evidence to raise an issue for the jury on the question of living and cohabiting together as husband and wife. In Grigsby

v. Reib, 105 Tex. 597, 153 S.W. 1124 (1913), the court said:

"Marriage is not a contract, but a status created by mutual consent of one man and one woman. The method by which it is solemnized or entered into may be by proceedings prescribed by statute, or by mutual agreement with cohabitation, but, however contracted, having the same elements, and producing the status of husband and wife. The sole difference which can legally exist is in the method of expressing consent; and the only particular in which a marriage as at common law can differ from the statutory method is the absence of license and the ceremony.

"The cohabitation must be professedly as husband and wife, and public, so that, by their conduct towards each other, they may be *known* as husband and wife. * * *"

In James v. James, supra, that court said that a mutual agreement to become husband and wife does not amount to marriage unless and until it brings the parties into the "normal relation" of husband and wife. In King v. King's Unknown Heirs, Tex.Civ.App., 16 S.W.2d 160 (rev. and remanded on other grounds, Com.App., 34 S.W.2d 804), the court relies on Grigsby v. Reib, supra, in support of this statement of the law:

"It does not matter whether marriage is, technically, a 'status' or a 'contract', or whether it be solemnized in the manner and form prescribed by statute, or simply by mutual agreement, it does and should mean the same thing to the parties, and must be evidenced to the public by the same conduct and mode and manner of living; the only difference being the absence, in [the] case of mutual consent, of license and public ceremony."

A number of out-of-state authorities supporting the view we take of this case can be found in McArthur v. Hall, 169 S.W.2d

724 (Ft. Worth Tex.Civ.App.1943, ref., w. m.). It relies primarily for its decision applying the law of Oklahoma on the case of Richard v. Richard, 172 Okl. 397, 45 P.2d 101. A particularly apt discussion of the term "cohabitation", as we consider the term to be used by the Texas courts, is found in this quotation:

"The court next cites Wallace's Case, 49 N.J.Eq. 530, 25 A. 260, in which 'matrimonial cohabitation' is discussed, and the New Jersey court quotes from In re Yardley's Estate, 75 Pa. 207, wherein it was said: 'But it is a misnomer to call the visits of Howard Yardley to Elizabeth Sithens cohabitation. It was lacking in its chief element,—constancy of dwelling together. * * * His visits to her were of an irregular kind, and though frequent and continual, bore no resemblance to married life.'

"This opinion states that matrimonial cohabitation is where the parties 'have the same habitation, so that where one lives and dwells, there does the other live and dwell always with him.'

"The opinion likewise lays down the rule that the repute must be general, extending to the friends and relatives of both parties, with whom their daily lives are spent, and such repute must not be divided."

In the case of Defferari v. Terry, 128 Tex. 521, 99 S.W.2d 290 (1936), the court recognized as authority early cases such as Sapp v. Newsom, 27 Tex. 537, and Lewis v. Ames, 44 Tex. 319, in holding that, "The evidence must *clearly show such marriage.*" This was a case in which Mrs. Dorothy Terry sought to recover under the will of her alleged grandmother, Mrs. Defferari. She recovered a judgment in the trial court, which was affirmed by the Court of Civil Appeals. In reversing and rendering these judgments, the court said:

"The jury by its verdict found: (1) That Mrs. Terry's parents prior to her birth agreed to become husband and wife; (2) that pursuant to the agreement they lived together as such; and (3) that during such time they held each other out to the public as husband and wife.

"It was upon the foregoing findings that the trial court rendered judgment, overruling the Defferaris' motion for an instructed verdict. The motion should have been granted if the evidence was *legally* insufficient to establish Mrs. Terry's claim of legitimacy."

 We find the evidence legally insufficient to establish a valid marriage between John Walter and Wanda Crenshaw. The judgment of the trial court that Frank Paul Walter and Wanda Dee Walter are the legitimate children of John Walter and entitled to share in the estate of Frank J. Walter is, accordingly, reversed and judgment is here rendered that they take nothing as against the appellants.

Reversed and rendered.